**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

CASE NO.: 12-60862-CIV-MIDDLEBROOKS/BRANNON

SHIRE DEVELOPMENT LLC,
SHIRE PHARMACEUTICAL
DEVELOPMENT INC.,
COSMO TECHNOLOGIES LIMITED, and
GIULIANI INTERNATIONAL LIMITED,

       Plaintiffs,

               v.

WATSON PHARMACEUTICALS, INC.,
WATSON LABORATORIES, INC. – FLORIDA,
WATSON PHARMA, INC., and
WATSON LABORATORIES, INC.,

       Defendants.

_____/

**<u>PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF</u>**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT .......................................................................................................2

      A.    Legal Principles Governing Claim Construction .....................................2

      B.    "Matrix" Means "a Macroscopically Homogeneous Structure in
            All its Volume" ........................................................................................4

      C.    "Inner Lipophilic Matrix" Means "A Matrix Including At Least
            One Lipophilic Excipient, Where the Matrix Is Located within One
            or More Other Substances" ......................................................................7

      D.    The "Outer Hydrophilic Matrix" Means "A Matrix of At Least One
            Hydrophilic Excipient, Where the Matrix Is Located Outside the
            Inner Lipophilic Matrix" ..........................................................................9

      E.    "Dispersed" Means "Sufficiently Mixed to Incorporate One
            Substance with Another" ........................................................................10

      F.    "Wherein the Active Ingredient Is Dispersed Both in [Said] the
            Lipophilic Matrix and in the Hydrophilic Matrix" Means "Wherein
            Mesalamine Is Incorporated With the Lipophilic Matrix and the
            Hydrophilic Matrix" ...............................................................................12

      G.    "Melting Point" Means "the Range of Temperatures at Which a
            Solid Begins to Liquefy" ........................................................................13

      H.    The Court Should Construe "Consisting of Substances Selected
            From the Group Consisting of Unsaturated and/or Hydrogenated
            Fatty Acid, Salts, Esters of Amides Thereof, Fatty Acid Mono-,
            Di- or Triglycerids, Waxes, Ceramides, and Cholesterol
            Derivatives with Melting Points Below 90° C" According to
            Plaintiffs' Construction ..........................................................................14

            1.    Patentees Did Not Disclaim "Conventional Lubricants"
                  From the List of Recited Lipophilic Substances During
                  Prosecution of the '720 Patent ....................................................15

      I.    Federal Circuit Law Compels Construing "Selected from the
            Group Consisting of" As An Exclusionary Term Specifying That
            An Element Contains Only What Is Expressly Set Forth In a
            Recited List, But Does Not Exclude Substances Unrelated To, Or
            Outside of the Context of Said Element ...................................................18

III.  CONCLUSION....................................................................................................19

## **TABLE OF AUTHORITIES**

**Cases**

*3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365 (Fed. Cir. 2003) ........................................................................................................ 16

*Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246 (Fed. Cir. 2011) ............................. 3

*Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241(Fed. Cir. 2000) ........................... 4, 16

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003)..................... 16

*Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998)............................... 3, 7

*Conoco Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006) ............................... 18

*Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317 (Fed. Cir. 2001) ........................ 15

*Ecolab v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001) ......................................... 4, 8, 10, 13

*Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335 (Fed. Cir. 2009).......................................................... 17

*Every Penny Counts, Inc. v. Bank of America Corp.*, 2008 WL 4491113, No. 2:07-cv-42 (M.D. Fla. Sept. 29, 2008)............................................................... 15

*Fresenius Med. Care Holdings, Inc. v. Paddock Labs., Inc.*, 742 F. Supp. 2d 158 (D. Mass. 2010)............................................................................................. 16

*Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367 (Fed. Cir. 2005)................................... 18

*In re Omeprazole Patent Litig.*, 84 Fed. Appx. 76 (Fed. Cir. 2003)............................................ 15

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373 (Fed. Cir. 2002) ......................................................................................................... 4

*Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279 (Fed. Cir. 1986) ..................................................................................................... 18

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ................................................. 2, 3

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ....................................... 3

*Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir. 2009)............................ 7

*Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004) ................................................. 18

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ..................................... 4, 16

iii

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ....................................................... passim

*Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011) ............................................... 5

*SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278 (Fed. Cir. 2005) .............................. 4, 16

*Sparton Corp. v. United States*, 68 Fed. Cl. 34 (Fed. Cl. 2005) ...................................................... 6

*Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002) ........................... 2, 3, 6

*Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367 (Fed. Cir. 2001)................................... 3, 7

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377 (Fed. Cir. 2000) .................... 18

*Versa Corp. v. Ag-Bag Intern. Ltd.*, 392 F.3d 1325 (Fed. Cir. 2004) ........................................... 15

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .................................... 3, 17

**Statutes**

35 U.S.C. § 371 ............................................................................................................................ 1

## I.    INTRODUCTION

Plaintiffs Shire Development LLC, Shire Pharmaceutical Development Inc., Cosmo Technologies Limited, and Giuliani International Limited (collectively "Plaintiffs") respectfully submit this opening claim construction brief for U.S. Patent No. 6,773,720 ("the '720 patent").[1] The '720 patent, attached hereto as Decl. Ex. 1,[2] contains four claims and one independent claim.[3]  The parties dispute the meanings of the following portions of claim 1: (1) "matrix," (2) "inner lipophilic matrix," (3) "outer hydrophilic matrix," (4) "dispersed," (5) "wherein the active ingredient is dispersed both in [said] the lipophilic matrix and in the hydrophilic matrix," (6) "melting point," (7) "consisting of substances selected from the group consisting of unsaturated and/or hydrogenated fatty acid, salts, esters, or amides thereof, fatty acid mono-, di- or triglycerids, waxes, ceramides, and cholesterol derivatives with melting points below 90°," and (8) "selected from the group consisting of."[4]

The Court should adopt Plaintiffs' proposed claim constructions for the disputed terms because Plaintiffs' proposed constructions adhere to the legal principles governing claim construction, align with the intrinsic and extrinsic evidence, and are set within a coherent framework consistent throughout all claims.  On the other hand, Defendants' proposed

---

[1]  Plaintiffs filed a complaint for patent infringement against Watson Pharmaceuticals, Inc., Watson Laboratories, Inc. – Florida, Watson Pharma, Inc., and Watson Laboratories, Inc. (collectively, "Defendants") alleging infringement of the '720 patent by the product that is the subject of Abbreviated New Drug Application ("ANDA") No. 203817 ("the Watson ANDA product").  [DE 43, Amended Compl.].

[2]  "Decl. Ex. __" refers to the Exhibits attached to the Declaration of Andrew Wasson in Support of Plaintiffs' Opening Claim Construction Brief, attached hereto as Exhibit A.  Plaintiffs have concurrently submitted Decl. Ex. 7, Opening Report of Professor Patrick J. Sinko ("Sinko Report") separately for filing under seal.

[3]  U.S. Patent Application Serial No. 10/009,491 ("the '491 Application," attached hereto as Decl. Ex. 2), which issued as the '720 patent on August 10, 2004, claims priority to June 14, 1999.  The '491 application entered the National Phase under 35 U.S.C. § 371 on December 13, 2001 from International Application No. PCT/EP00/05321, which was filed on December 21, 2000, claiming priority to Italian Application No. MI99A1316, filed on June 14, 1999.

[4]  The Parties have agreed on the meanings of "controlled-release oral pharmaceutical compositions," "hydrophilic," "lipophilic," and "hydrogenated fatty acid."  Decl. Ex. 3, Joint Claim Construction Statement [DE 68] ("JCCS") at 3.  Plaintiffs do not take a position at this time as to whether the phrase "controlled-release oral pharmaceutical compositions," situated within the preamble of the claims, operates as a claim limitation as the issue has not been joined.

constructions depart substantially from Federal Circuit precedent, find little or no support in the intrinsic record, and present a patchwork and inconsistent view of the '720 patent.

Claim 1 of the '720 patent is reproduced below:

> 1.  Controlled-release oral pharmaceutical compositions containing as an active ingredient 5-amino-salicylic acid, comprising:
>     a)  an inner lipophilic matrix consisting of substances selected from the group consisting of unsaturated and/or hydrogenated fatty acid, salts, esters or amides thereof, fatty acid mono-, di- or triglycerids, waxes, ceramides, and cholesterol derivatives with melting points below 90º C., and wherein the active ingredient is dispersed both in said the lipophilic matrix and in the hydrophilic matrix;
>     b)  an outer hydrophilic matrix wherein the lipophilic matrix is dispersed, and said outer hydrophilic matrix consists of compounds selected from the group consisting of polymers or copolymers of acrylic or methacrylic acid, alkylvinyl polymers, hydroxyalkyl celluloses, carboxyalkyl celluloses, polysaccharides, dextrins, pectins, starches and derivatives, alginic acid, and natural or synthetic gums;
>     c)  optionally other excipients;
>     wherein the active ingredient is present in an amount of 80 to 95% by weight of the total composition, and wherein the active ingredient is dispersed both in the lipophilic matrix and in the hydrophilic matrix.

## II.    ARGUMENT

### A.    Legal Principles Governing Claim Construction

Claim construction is a matter of law that is determined by the court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384-91 (1996).  "We have made clear . . . that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).[5]  Ordinary meaning may be determined by reviewing a variety of sources, both intrinsic and extrinsic.  *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299

---

[5] Plaintiffs' expert witness Dr. Patrick J. Sinko has opined that a person of ordinary skill in the art at the time of invention is one who has a Bachelor of Science Degree in Pharmacy or Chemical Engineering (or an equivalent level of education or training) and at least three years of experience in the field of drug delivery technology or similar technical field of study.  Decl. Ex. 7, Sinko Report at ¶¶22-23.

F.3d 1313, 1324-25 (Fed. Cir. 2002).  Yet, where the "specification [reveals] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . . the inventor's lexicography governs."  *Phillips*, 415 F.3d at 1316.  In construing the claims, the court should seek to "preserve the patent's internal coherence."  *See Markman*, 517 U.S. at 389-90; *see also Phillips*, 415 F.3d at 1314 (relying on the assumption that "claim terms are normally used consistently throughout the patent").

When the meaning of a claim term is in dispute, courts primarily look to the intrinsic evidence in the record, i.e. the patent itself, including its claims, the specification, and the prosecution history.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  As a starting point, "the claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  The claims, however, "must be read in view of the specification, of which they are a part."  *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370.  In fact, the Federal Circuit has designated the specification "the single best guide to the meaning of a disputed term."  *Vitronics*, 90 F.3d at 1582.  Additionally, courts consider "the complete record of the proceedings before the PTO[, including] the prior art cited during examination" as evidence of the inventor's understanding of the patent.  *Phillips*, 415 F.3d at 1317.  Extrinsic evidence such as dictionaries, treatises, and/or expert testimony may also be helpful in construing patent claims.  *Id.* at 1317-18.  All extrinsic evidence, however, should be considered in the context of the intrinsic evidence.  *Id*. at 1319.

While the claims should be read in view of the specification, Federal Circuit precedent establishes that "limitations from the specification are not to be read into the claims."  *Teleflex*, 299 F.3d at 1326.  "The specification does not "delimit[ ] the scope of legal protection."  *See Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1255 n.2 (Fed. Cir. 2011).  Rather, "[c]laims define and circumscribe, the written description discloses and teaches."  *Id.* (quoting *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed. Cir. 2010) (internal quotations omitted).  "The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  *Teleflex*, 299 F.3d at 1325.[6]

---

[6]  In addition, this prohibition against creating additional limitations not present in the claims includes attempts to limit a structural claim term by also requiring a function.  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998); *see also Toro Co. v.*

"[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant . . . it often lacks the clarity of the specification and thus is less useful." *Phillips*, 425 F.3d. at 1317; *see also Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (ambiguity of the prosecution history diminished its relevance to claim construction).  Courts should not limit claim language based on the prosecution history unless "the alleged disavowing actions or statements made during prosecution [are] both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003)  A statement or argument made during prosecution cannot constitute a "clear and unmistakable disclaimer" if it is "subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005); *see also Inverness Med.*, 309 F.3d at 1382 (refusing to limit a broad definition of a claim in light of alternate plausible explanations of the prosecution history).  In assessing the clarity of an alleged disclaimer, "the prosecution history must be examined as a whole" to determine whether "a competitor would reasonably believe that the applicant had surrendered the relevant subject matter."  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1252 (Fed. Cir. 2000).

### B.   "Matrix" Means "a Macroscopically Homogeneous Structure in All its Volume"

Plaintiffs' proposed construction of "matrix" ("a macroscopically homogeneous structure in all its volume") reflects its ordinary and customary meaning and is consistent with the intrinsic and extrinsic record.  In fact, the Plaintiffs draw the proposed construction of "matrix" verbatim from the specification.

The '720 patent specification describes "matrix" in the following way:

> The compression of the mixture of lipophilic matrix, hydrogel-forming compounds and, optionally, active ingredient non inglobated in the lipophilic matrix, <u>yields a macroscopically homogeneous structure in all its volume, namely a matrix</u> containing a dispersion of the lipophilic granules in a hydrophilic matrix.

---

*White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) ("An invention claimed in purely structural terms generally resists functional limitation."); *see also Ecolab v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation.").

Decl. Ex. 1, '720 patent col.3 ll.40-45 (emphasis added).[7]  In other words, the passage describes a matrix as "a macroscopically homogeneous structure in all its volume."  This theme (that a "matrix" is a "macroscopically homogeneous structure") is manifest throughout the specification.  For example, the specification contrasts another structure (a "reservoir") with a "matrix," stating: "The resulting structure is a 'reservoir', i.e. is not macroscopically homogeneous along all the symmetry axis of the final form."  *Id.* at col.1 ll.62-65 (emphasis added).  Both passages, along with the rest of the specification, strongly support Plaintiffs' proposed construction of matrix.  *See also id.* at col.1 l.4 - col.2 l.32; col.3 ll.14-24; col.3 l.57 - col.4 l.5; col.4 l.8 - col.5 l.45.

The prosecution history of the '720 patent additionally supports Plaintiffs' proposed construction of "matrix."  During prosecution, the patentees illustrated the differences between a "matrix system" and a "reservoir system" by citing four references.  Decl. Ex. 2, '491 Application, Amendment and Remarks at 6-7 (Oct. 9, 2003).[8]  One representative reference describes matrix dosage forms in the following way: "The word *monolithic* refers to a single mass or block of material.  In the field of controlled drug delivery, the term *monolithic device* refers to a rate-controlling polymer matrix throughout which the drug is dissolved or dispersed."  Decl. Ex. 2, '491 Application, ALFRED MARTIN, PHYSICAL PHARMACY: PHYSICAL CHEMICAL PRINCIPLES IN THE PHARMACEUTICAL SCIENCES 515 (4th ed. 1993) ("Martin's Physical Pharmacy").[9]  In addition, Martin's Physical Pharmacy provides the following illustration of a matrix:

---

[7]  The word "namely" in the above passage connotes definition.  "Namely" is a logical connective used to show apposition.  Decl. Ex. 4, THE OXFORD ENGLISH GRAMMAR 382-83 (Oxford Univ. Press 1996).  Apposition is "[a] construction in which a noun or noun phrase is placed with another as an explanatory equivalent."  Decl. Ex. 5, THE AMERICAN HERITAGE DICTIONARY 34 (1985); *see also* Decl. Ex. 6, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 771 (10th ed. 1994) (defining "namely" as "that is to say").

[8]  "[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence."  *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed. Cir. 2011) (quoting *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003)).

[9]  *See also* Decl. Ex. 2, '491 Application, Jantzen et al., *Sustained- and Controlled-Release Drug Delivery Systems*, *in* MODERN PHARMACEUTICS 586-87 (Banker & Rhodes eds. 3rd. ed. 1996) ("A matrix device, as the name implies, consists of drug dispersed homogeneously throughout a polymer matrix as represented in Fig. 7." ); Decl. Ex. 2, '491 Application, Paul A. Steward, *Review of Pharmaceutical Controlled Release Methods and Devices* ("Steward"); and Decl.



*Id.* at 516.  Each reference cited by the patent applicants directly supports Plaintiffs' proposed construction because each describes matrix structures in terms of macroscopically homogeneous material.  Even the current editor of Martin's Physical Pharmacy, Dr. Patrick J. Sinko, concurs that the references cited by the patent applicants during prosecution support Plaintiffs' proposed construction and do not support Defendants' proposed construction.  *See* Decl. Ex. 7, Sinko Report at ¶¶ 53-58.[10]

By contrast, Defendants' proposed construction of "matrix" would have this Court import a limitation of controlled or delayed release of active ingredient into the claim.[11]  Federal Circuit precedent uniformly warns against precisely this error of interpretation.  *E.g. Teleflex*, 299 F.3d at 1326.  While Defendants maintain that passages in the intrinsic record "disclose, discuss and/or describe matrices that provide a controlled-release function(s) that slow dissolution of the active ingredient,"[12] mere disclosure, discussion, and/or description alone is not enough.  Rather, the specification must evince, "a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."  *Martek Biosciences Corp. v. Nutrinova, Inc.*,

---

Ex. 2, '491 Application, English translation of L. Moro et al., *Drug Delivery Systems: Sistemi a Rilascio Controllato*, 26(5) PRODOTTO CHIMICO & AEROSOL SELEZIONE 22 (1985) (in Italian at Decl. Ex. 2).

[10]  Dr. Sinko reviewed the patent, file history, and references cited therein, concluding that a person of ordinary skill in the art at the time of invention would have understood matrix to mean "a macroscopically homogeneous structure in all its volume."  Decl. Ex. 7, Sinko Report at ¶¶53-58.  Dr. Sinko's testimony is particularly relevant here because he is the current editor of Martin's Physical Pharmacy, one of the references cited by the patent applicants to illustrate the meaning of matrix.

[11]  It should also be noted that Defendants' proposed definition is circular because it defines "matrix" using the word that it attempts to define.  *See Sparton Corp. v. United States*, 68 Fed. Cl. 34, 47 (Fed. Cl. 2005) ("To the extent that Plaintiff's proposed meaning is a circular definition (i.e., one that uses the word that it attempts to define in the definition itself), it is clearly improper.").

[12]  *See* Decl. Ex. 3, JCCS, Exhibit B at 7.

579 F.3d 1363, 1381 (Fed. Cir. 2009).  None of the passages cited by the Defendants evince such an intention.  At most, the specification indicates that a function of the matrix is to affect release; a far cry from an explicit requirement that a matrix should be defined according to those terms.  Therefore, the Court should not restrict "matrix" to a structure that "controls or delays release of the active ingredient."

What is more, it is improper here to read a functional limitation into a structural claim element.  *See, e.g.*, *Toro Co.*, 266 F.3d at 1371 ("This court's claim construction, however, did not and could not import into the claim a function from the specification, particularly when the claim recites only purely structural limitations."); *see also Comark Commc'ns*, 156 F.3d at 1186-87 (refusing to limit the claimed phrase by a function described in a preferred embodiment).  Here, Defendants attempt to append functional language ("that controls or delays release of the active ingredient") to a purely structural claim element ("matrix").  Defendants' proposed construction fails for this additional reason.

Defendants' proposed construction is incorrect for the additional reason that it requires "active ingredient dispersed homogeneously throughout."  The claim already requires active ingredient dispersed throughout the matrices ("wherein the active ingredient is dispersed both in [said] the lipophilic matrix and in the hydrophilic matrix").  This additional claim language strongly implies that a matrix need not include active ingredient.  *Phillips*, 415 F.3d at 1314 (the claim language "steel baffles" strongly implies that the term "baffles" does not mean objects made of steel).  Even having said that, the figure from Martin's Physical Pharmacy (reproduced *supra*) referring to "drug in polymer matrix" demonstrates the matrix is the polymer structure itself and by contrast, drug is located within that structure.  Therefore, it would be incorrect to construe "matrix" to require active ingredient dispersed throughout.

> **C.   "Inner Lipophilic Matrix" Means "A Matrix Including At Least One Lipophilic Excipient, Where the Matrix Is Located within One or More Other Substances"**

The Court should construe "inner lipophilic matrix" to mean "a matrix including at least one lipophilic excipient, where the matrix is located within one or more other substances."  The claim language in and of itself supports this construction.  The words "inner" and "lipophilic" are both adjectives that modify the noun, "matrix."  Consistent with the claim language, the specification confirms that the patentees intended that a matrix could come in different forms: a lipophilic matrix or a hydrophilic matrix depending on the nature of its constituents.  "The

compression of the mixture of <u>lipophilic matrix</u>, hydrogel-forming compounds and, optionally, active ingredient non inglobated in the <u>lipophilic matrix</u>, yields a macroscopically homogeneous structure in all its volume, namely a <u>matrix</u> containing a dispersion of the <u>lipophilic</u> granules in a hydrophilic matrix." Decl. Ex. 1, '720 patent, col.3 ll.40-45 (emphasis added). Given that "lipophilic" modifies "matrix," the straightforward interpretation of a "lipophilic matrix" is a "matrix" of at least one lipophilic excipient. That the matrix can accommodate "at least one" lipophilic excipient is evident from the specification: "the active ingredient is first inglobated in a low melting excipient or mixture of excipients . . . ." *Id.* at col.2 ll.50-51.

The specification also supports that an "inner" lipophilic matrix is a lipophilic matrix located within one or more other substances. Examples 1-4 in the '720 patent consistently disclose granules including a lipophilic substance mixed with one or more ingredients: both the hydrophilic excipients such as sodium starch glycolate, but also other excipients such as colloidal silicon dioxide. *E.g.*, *id.* at col.4 ll.34-44.[13] Thus, the granules of lipophilic substance and mesalamine are "inner" because they are located within the extra-granular blend of other excipients, including hydrophilic excipients.

Defendants' proposed construction of "inner lipophilic matrix" shares the same flaws as Defendants' proposed construction of "matrix." Again, it would be redundant to construe "inner lipophilic matrix" to require "active ingredient dispersed homogeneously within" because claim 1 already explicitly requires "active ingredient is dispersed both in [said] the lipophilic matrix and in the hydrophilic matrix." *See Phillips*, 415 F.3d at 1314 (claim language itself probative of interpretation that avoids redundancy). In addition, it is simply not correct to say that the specification or any of the references cited in the prosecution history define matrix in terms of active ingredient. As shown above, the intrinsic record consistently shows that persons of ordinary skill in the art at the time of invention considered a matrix and active ingredient as separate concepts.

In addition, Defendants' construction requiring lipophilic matrix as "separate and distinct from" the outer hydrophilic matrix is not grounded in the intrinsic record. A court will not create a limitation in the claims that has no basis in the intrinsic record. *See Ecolab*, 264 F.3d at 1366 (affirming district court's refusal to import limitation with "no basis in the intrinsic record"). The phrase "separate and distinct" is not once found in the claims, specification, or file history of

---

[13] *See also id.* at col.4 ll.10-21; col.4 ll.55-64; col. 5 ll.8-19; col.5 ll.31-37.

the '720 patent.  Furthermore, none of the passages cited by the Defendants support their contention that the "inner lipophilic matrix" should be "separate and distinct" from any other structure in the composition.  For example, the statement in the specification,"[s]aid barrier antagonizes the starting 'burst effect' caused by the dissolution of the medicament inglobated inside the inert matrix," cited by Defendants, does not suggest that the lipophilic matrix and hydrophilic matrix are "separate and distinct."  *E.g.* Decl. Ex. 1, '720 patent, col. 2 ll.64-67.  To the contrary, this statement demonstrates that the inner lipophilic matrix and the outer hydrophilic matrix are mixed together.  *E.g.* Decl. Ex. 7, Sinko Report at ¶82; *see also* Decl. Ex. 1, '720 patent, col.2 ll.54-59, col.3 ll.31-32, col.3 ll.40-45, and col.4 l.8 - col.6 l.5; *see also* Decl. Ex. 2, '491 Application, Amendment and Remarks (Apr. 29, 2003); Decl. Ex. 2, '491 Application, Amendment and Remarks (Oct. 9, 2003).

> **D.     The "Outer Hydrophilic Matrix" Means "A Matrix of At Least One Hydrophilic Excipient, Where the Matrix Is Located Outside the Inner Lipophilic Matrix"**

The Court should construe the phrase "outer hydrophilic matrix" to mean "a matrix of at least one hydrophilic excipient, where the matrix is located outside the inner lipophilic matrix." As demonstrated above in the context of "inner lipophilic matrix," the claim language itself provides evidence in favor of Plaintiffs' proposed construction.  The claimed language indicates that "outer" and "hydrophilic" are adjectives that modify the noun, "matrix."  *See e.g.* Decl. Ex. 1, '720 patent, col.3 ll.40-45.  In other words, a "hydrophilic" matrix refers to a certain type of matrix, and an "outer" hydrophilic matrix refers to a certain type of "hydrophilic matrix." Therefore, in the same way that a "lipophilic matrix," is a "matrix" of at least one lipophilic excipient, a "hydrophilic matrix" is a "matrix" of at least one hydrophilic excipient.  In addition, a hydrophilic matrix should mean "at least one" hydrophilic excipient because the specification makes clear that "the inert matrix granules are subsequently mixed with one or more hydrophilic water-swellable excipients . . . ."  *Id.* at col.2 ll.57-59.

The specification also supports that an "outer" hydrophilic matrix is a hydrophilic matrix, "where the matrix is located outside the inner lipophilic matrix."  Examples 1-4 in the '720 patent consistently disclose lipophilic granules mixed with hydrophilic excipients.  *Id.* at col.

ll.34-44.[14] Thus, the hydrophilic excipients are part of the "outer hydrophilic matrix" because they are located outside of the granules of inner lipophilic matrix.

Defendants' proposed construction for "outer hydrophilic matrix" is deficient for the same reasons set forth above in the context of "matrix," and "inner lipophilic matrix." First, Defendants' proposed construction requires active ingredient homogeneously dispersed throughout. As described above, this construction is incorrect because: (1) it is redundant to construe claim language requiring "active ingredient [to be] dispersed both in [said] the lipophilic matrix and in the hydrophilic matrix," and (2) the intrinsic record confirms that a person of ordinary skill in the art at the time of invention would not have viewed a matrix as defined by active ingredient. In addition, there is no support in the intrinsic record for Defendants' proposed construction, which requires a "separate and distinct" hydrophilic matrix and lipophilic matrix. *See Ecolab*, 264 F.3d at 1366 (Fed. Cir. 2001). To the contrary, the record demonstrates that the inner lipophilic matrix and the outer hydrophilic matrix are mixed together. *E.g.* Decl. Ex. 7, Sinko Report at ¶82; *see also* Decl. Ex. 1, '720 patent, col.2 ll.54-59, col.3 ll.31-32, col.3 ll.40-45, and col.4 l.8 - col.6 l.5; *see also* Decl. Ex. 2, '491 Application, Amendment and Remarks (Apr. 29, 2003); Decl. Ex. 2, '491 Application, Amendment and Remarks (Oct. 9, 2003).

> **E.** **"Dispersed" Means "Sufficiently Mixed to Incorporate One Substance with Another"**

Plaintiffs' proposed construction of "dispersed" ("sufficiently mixed to incorporate one substance with another") is supported by the intrinsic and extrinsic record. Dispersion need not require mixing with mathematical precision. Rather, Plaintiffs' proposed construction contemplates that dispersion should be construed to mean "sufficiently mixed to incorporate one substance with another."

The specification supports Plaintiffs' construction and reflects the understanding of a person of ordinary skill in the art at the time of invention. For instance, Example 1 refers to a homogeneous "dispersion" that results from mixing active ingredient and lipophilic substances sufficiently to incorporate the substances with each other. Decl. Ex. 1, '720 patent col.4 ll.10-

---

[14] *See also id.* at col.4 ll.10-21; col.4 ll.55-63; col.5 ll.8-19; col.5 ll.31-39.

12.[15]  Example 1 states, "770 g of 5-aminosalicylic acid are added in a kneader with 20 g of carnauba wax and 50 g of stearic acid with heating until homogeneous dispersion."  *Id.* at col.4 ll.10-12.  Thereafter, "[t]he inert matrix granules are loaded into a mixer in which 30 g of Carbopol 971P[(R)] and 65 g of hydroxypropyl methylcellulose are sequentially added. . . . [for] a first mixing step for homogeneously dispersing the powders."  *Id.* at col.4 ll.14-19.  Examples 2-4 similarly suggest that dispersion occurs after incorporation in a mixer, kneader or granulator.  *E.g., id.* at col.4 ll.34-36 (kneading with heating until homogeneous "dispersion").[16]  The processes described as "dispersion" in the Examples all involve mixing sufficiently to incorporate one substance with another.  Decl. Ex. 7, Sinko Report at ¶104.

Plaintiffs' proposed construction is also consistent with common usage as reflected in general purpose dictionaries.  Merriam-Webster's Collegiate Dictionary provides a definition of "dispersed" that comports with the intrinsic record: "to cause to become spread widely" and "to distribute (as fine particles) more or less evenly throughout a medium."  Decl. Ex. 6, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 335 (1994).  This definition confirms that "dispersed," as used in the '720 patent reflects a more or less even mixture (i.e. "sufficiently" mixed).

The Plaintiffs disagree that the construction of "dispersed" requires a "homogenous" mixture.  The phrase "homogeneous dispersion," found throughout the specification, does not favor an interpretation of "dispersed" that means "homogenously [sic] mixed or dispersed."  If "dispersed" truly was defined in terms of a "homogenous" mixture as Defendants suggest, then there would be no need to qualify the word "dispersion" in the specification with the adjective "homogeneously."  In other words, such qualification would be redundant: "dispersion" would already mean "homogeneous."

---

[15] Defendants admit that the term "incorporate" appears in the '720 patent, but argue that, "the word is not used in a context that supports Shire's construction."  Decl. Ex. 3, JCCS, Exhibit B at 9.  Contrary to this assertion, use of the term "incorporate" supports Plaintiffs' construction.  For example, the '720 patent states, "…while heating to soften and/or melt the excipient itself, which thereby incorporates the active ingredient by simple dispersion."  Decl. Ex 2, '720 patent, col.2 ll.51-53.  This passage refers to a "dispersion" which is created by the incorporation of lipophilic excipients and active ingredient to achieve a sufficient mixture.  Therefore, the usage of the word "incorporate" in Plaintiffs' proposed construction is supported by the specification.

[16] *See also id.* at col.4, ll.55-57 (add ingredients to granulator/kneader with heating until "homogeneous dispersion"); col..5, ll.10-13 (add ingredients to homogenizer/granulator "to obtain a homogeneous solid mixture"); col.5, ll.31-33 (add ingredients to mixer with heating until "homogeneous dispersion").

F.    **"Wherein the Active Ingredient Is Dispersed Both in [Said] the Lipophilic Matrix and in the Hydrophilic Matrix" Means "Wherein Mesalamine Is Incorporated With the Lipophilic Matrix and the Hydrophilic Matrix"**

This Court should interpret the phrase "wherein the active ingredient is dispersed both in [said] the lipophilic matrix and in the hydrophilic matrix" to mean "wherein mesalamine is incorporated with the lipophilic matrix and the hydrophilic matrix."  Other than the terms in dispute ("matrix" and "dispersed") and the terms that do not have disputed meanings ("lipophilic," "hydrophilic," "active ingredient"[17]), the other terms found in this phrase are commonly understood words (e.g. "both," "in," "and") that should be interpreted according to their widely accepted meanings.  Altogether then, interpreting this phrase only requires understanding the relationship of claim terms like "matrix," "dispersed," "lipophilic," "hydrophilic," and "active ingredient," as mediated by the commonly understood words (e.g., "both," "in," "and").

Understanding this relationship is straightforward.  The subject of the phrase (active ingredient) is dispersed both in the lipophilic matrix and in the hydrophilic matrix.  Therefore, the proper construction of this phrase must take into account two separate requirements: (1) the dispersion of active ingredient in the inner lipophilic matrix, and (2) the dispersion of active ingredient in the outer hydrophilic matrix.  Plaintiffs' construction is correct because it takes into account both of the above requirements and does not depart from the ordinary meaning of the claim language.

The specification is consistent with Plaintiffs' interpretation because it discloses oral pharmaceutical compositions where: (1) mesalamine is incorporated with the inner lipophilic matrix, and (2) mesalamine is incorporated with the outer hydrophilic matrix.  For instance, Example 1 describes a pharmaceutical composition containing active ingredient incorporated with the inner lipophilic matrix.  Example 1 states, "770 g of 5-aminosalicylic acid are added in a kneader with 20 g of carnauba wax and 50 g of stearic acid with heating until homogeneous dispersion, then extruded into small granules when cold."  Decl. Ex. 1, '720 patent, col.4 ll.10-14.  Example 1 also states that the granules are mixed with hydrophilic excipients.  *Id.* at col.4 ll.14-16.  Therefore, Example 1 discloses pharmaceutical compositions that contain mesalamine

---

[17] The Defendants do not appear to contest that "active ingredient" means 5-amino-salicylic acid (mesalamine).  Decl. Ex. 3, JCCS, Exhibit B at 3-5.

incorporated with the inner lipophilic matrix (the granules of mesalamine and at least carnauba wax and stearic acid).  Example 1 also discloses pharmaceutical compositions that contain mesalamine incorporated with the outer hydrophilic matrix (the granules of mesalamine mixed with the hydrophilic excipients).

Again, Defendants incorrectly ask the Court to create a limitation that has no basis in the intrinsic record (that active ingredient needs to be "in direct contact with" the lipophilic matrix and the hydrophilic matrix).  *See Ecolab*, 264 F.3d 1358, 1366 (Fed. Cir. 2001).  None of the passages cited by Defendants support this proposed construction.  For example, neither the specification nor the file history uses the phrase "directly contacting."  Defendants simply fail to advance any theory that warrants  inclusion of this extraneous limitation.  Consequently, the Court should not construe the phrase, "wherein the active ingredient is dispersed both in [said] the lipophilic matrix and in the hydrophilic matrix" to require "direct contact" between the active ingredient and either matrix.

### G.  "Melting Point" Means "the Range of Temperatures at Which a Solid Begins to Liquefy"

The Court should construe "melting point" to mean "the range of temperatures at which a solid begins to liquefy."[18]  Plaintiffs' construction reflects the plain and ordinary meaning to a person of ordinary skill in the art at the time of invention and currently.  The parties agree that the phrase should be construed as "a range of temperatures," and should be measured at the beginning of a transition from a solid.  However, the parties disagree as to whether the term means "begins to liquefy" (Plaintiffs' construction) or "begins to change from solid to liquid" (Defendants' construction).  Plaintiffs' construction is consistent with intrinsic evidence and is directly supported by extrinsic evidence.  Defendants have not thus far identified any evidence (intrinsic or extrinsic) supporting their interpretation.  The Court should construe "melting point" according to Plaintiffs' supported construction.

The intrinsic record supports Plaintiffs' proposed construction.  For example, U.S. Patent No. 4,921,757 to Wheatley et al. ("Wheatley," Decl. Ex. 8), cited in the file history of the '720

---

[18] The phrase "melting point" as well as the phrase "melting points below 90° C" are not limitations in and of themselves, but are part of a larger phrase (construed *infra* at Section II.H) that is a limitation to the claim.  That limitation—"an inner lipophilic matrix consisting of substances selected from the group consisting of . . . with melting points below 90° C"— provides the context for the phrase "melting point" from the intrinsic claim language.

patent states, "[t]ransition of the membrane from the rigid to the fluid state occurs as the temperature is raised above the 'melting temperature.'"  Decl. Ex. 8, Wheatley at col.1 ll.39-41; *see also* Decl. Ex. 1, '720 patent, col.2 ll.50-53 ("[T]he active ingredient is first inglobulated in a low melting excipient or mixture of excipients, while heating to soften and/or melt the excipient itself, which thereby incorporates the active ingredient by simple dispersion.").

Extrinsic evidence further supports Plaintiffs' construction.  Chambers Science and Technology Dictionary ("Chambers") defines "melting point" as: "The temperature at which a solid begins <u>to liquefy</u>.  Pure metals, eutectics, and some intermediate constituents melt at a constant temperature.  Alloys generally melt over a range."  Decl. Ex. 9, CHAMBERS SCIENCE AND TECHNOLOGY DICTIONARY 562 (1988) (emphasis added).  In fact, Defendants have largely agreed with the definition taken directly from Chambers, only Defendants argue that "liquefy" is not clear because it "can mean many different things depending on the context in which the word is used."  Defendants' assertion is wholly unsupported.  Defendants fail to identify a single relevant context outside of the definition of "melting point" that would render its use in the construction unclear.  Therefore, the court should construe "melting point" according to Plaintiffs' proposed construction.

### H.    The Court Should Construe "Consisting of Substances Selected From the Group Consisting of Unsaturated and/or Hydrogenated Fatty Acid, Salts, Esters of Amides Thereof, Fatty Acid Mono-, Di- or Triglycerids, Waxes, Ceramides, and Cholesterol Derivatives with Melting Points Below 90° C" According to Plaintiffs' Construction

The Court should adopt Plaintiffs' proposed construction of the phrase "consisting of substances selected from the group consisting of unsaturated and/or hydrogenated fatty acid, salts, esters, or amides thereof, fatty acid mono-, di- or triglycerids, waxes, ceramides, and cholesterol derivatives with melting points below 90°C" because it hews closely to the plain language of the claim, comports with the intrinsic evidence, and reflects the understanding of a person of ordinary skill in the art at the time of invention.[19]

---

[19] Plaintiffs propose the following construction of this phrase:  "containing one or more of the following substances: unsaturated fatty acid, salt of an unsaturated fatty acid, ester of an unsaturated fatty acid, amide of an unsaturated fatty acid, hydrogenated fatty acid, salt of a hydrogenated fatty acid, ester of a hydrogenated fatty acid, amide of a hydrogenated fatty acid, fatty acid monoglycerid, fatty acid diglycerid, fatty acid triglycerid, wax, ceramide, cholesterol derivative with melting points below 90º C."

The specification supports Plaintiffs' construction that the recited language requires, "one or more" of the substances in the list that follows in the claim.  The term "substances" in the plural refers to the multiple substances in the following recited list.  Consistently, while the specification discloses multiple types of lipophilic excipients, it also explicitly states that the inner lipophilic matrix can be obtained with a single excipient.  *See* Decl. Ex. 1, '720 patent, col. 2 ll.50-56 ("[T]he active ingredient is first inglobulated in a low melting <u>excipient or mixture of excipients</u>, while heating to soften and/or melt the excipient itself, which thereby incorporates the active ingredient by simple dispersion.  After cooling at room temperature an inert matrix forms, which can be reduced in size to obtain matrix granules containing the active ingredient particles.") (emphasis added).

Plaintiffs' interpretation also follows Federal Circuit precedent recognizing that, "in context, the plural can describe a universe ranging from one to some higher number, rather than requiring more than one number."  *Versa Corp. v. Ag-Bag Intern. Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004); *see also In re Omeprazole Patent Litig.*, 84 Fed. Appx. 76, 80 (Fed. Cir. 2003) (construing "materials," a "plural term does not necessarily require multiple compositions" when it "reflects an attempt to achieve grammatical consistency"); Decl. Ex. 10, *Every Penny Counts, Inc. v. Bank of America Corp.*, 2008 WL 4491113, No. 2:07-cv-42, at \*5-6 (M.D. Fla. Sept. 29, 2008).  Further, if the patentees had wanted to require at least two of the listed substances in the inner lipophilic matrix, they would have done so explicitly.  *See Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1328 (Fed. Cir. 2001).

1.    **Patentees Did Not Disclaim "Conventional Lubricants" From the List of Recited Lipophilic Substances During Prosecution of the '720 Patent**

The Court should not adopt Defendants' proposed construction, which calls for explicitly "excluding any substance in the list below when used as conventional lubricant."  This proposed limitation is improper because:  (1) it appears nowhere in the actual claim language; (2) it is specifically contradicted by the claim language—which includes classes of lipophilic substances that are conventional lubricants; (3) it would read out lipophilic substances used in the Examples of the patent, in contravention of Federal Circuit precedent; and (4) the applicants did not clearly and unmistakably disavow claim scope related to conventional lubricants during prosecution.  Thus, there is <u>no</u> basis for introducing such a limitation.

15

Defendants attempt to argue that applicants' statements during prosecution limit the claims by excluding "conventional lubricants" from the list of recited lipophilic substances. That is <u>not</u> so. Federal Circuit precedent establishes that a limitation from the file history cannot be read into the claims unless the applicant has narrowed the claims by amendment and/or has made unequivocal statements limiting the scope of the claims. *Omega Eng'g, Inc.* 334 F.3d at 1325-26 (disclaimer of subject matter by argument alone during prosecution must be clear and unmistakable); *SanDisk Corp.*, 415 F.3d at 1287-90 (statement is not "clear and unmistakable" if it is "subject to more than one reasonable interpretation"); *see Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) (When the prosecution history does not evince clear and unmistakable disavowal, the court must "give the claim term its full breadth of ordinary meaning as understood by persons skilled in the relevant art."); *Fresenius Med. Care Holdings, Inc. v. Paddock Labs., Inc.*, 742 F. Supp. 2d 158, 165-66 (D. Mass. 2010) (argument during prosecution distinguishing prior art as a "horse pill" not "clear disclaimer"). The statement at issue in the file history of the '720 patent distinguished the prior art ("Franco") on the basis that Franco disclosed a "reservoir" structure, whereas the claims were directed to a "matrix" structure, that:

> As to the magnesium stearate, magnesium stearate is included in the core taught by FRANCO et al. However, the present invention <u>does not require</u> that magnesium stearate be used in the lipophilic matrix. The excipient may be used in the final tabletting step according to its conventional lubricant properties.

Decl. Ex. 2, '491 Application, Amendment and Remarks at 6 (Apr. 29, 2003) (emphasis added). That the present invention "does not require" a lubricant be used in the matrix is hardly the "clear and unmistakable disavowal" required by Federal Circuit precedent. Indeed, the best Defendants can say of this unclear statement is that it is an "implicit" disavowal—which does not suffice under the "clear and unmistakable" standard.

The analysis of "disavowal" or "disclaimer" also requires an assessment of the file history in its entirety. *See Bayer AG*, 212 F.3d at 1252 (disclaimer must be assessed examining the prosecution history as a whole); *see also 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373 (Fed. Cir. 2003). It is of particular significance that: (1) the Examiner was

unpersuaded by the statement quoted above and maintained the rejection;[20] and (2) applicants subsequently amended the claims to specifically encompass numerous conventional lubricants.[21] For a case with facts that are very much on point, see *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009).

Of note in this regard is that stearic acid (a lipophilic substance used in Examples 1, 2, 4, and 5) is, and was understood at the time to be, a conventional lubricant. *See, e.g.*, Decl. Ex. 11, Allen, LV, *Stearic Acid, in* HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 494, 494 (2d ed. 1994); Decl. Ex. 12, Allen, LV, *Stearic Acid, in* HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 697, 697 (6th ed. 2009) (identifying stearic acid as a lubricant).  If conventional lubricants are read out of the claim as lipophilic substances—as Defendants propose—these Examples will be read out of the claim's coverage.  Such a construction is "rarely, if ever correct." *Vitronics*, 90 F.3d at 1583.

In sum, Defendants seek to limit the claim without justification and in contravention of Federal Circuit precedent in several regards.  Their construction should be rejected—and Plaintiffs' construction accepted.

---

[20] In the Final Rejection that followed, the Examiner recognized that despite any argument by the patent applicants, the claims still encompassed all conventional lubricants: "Applicant argues that the present invention does not require the use of surfactant.  However, the term 'substances' recites [sic] in applicant's generic claim permits the present [sic] of surfactant." Decl. Ex. 2, '491 Application, Final Office Action (Jun. 9, 2003) at 3.  *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009).

[21] Rather than surrender to the Examiner's continued argument and amend the claims to exclude surfactants or conventional lubricants, the patent applicants did just the opposite:  they amended the claims to specifically include hydrogenated salts of fatty acids (which include conventional lubricants) still fell within the scope of the claim.  Decl. Ex. 2, '491 Application, Amendment and Remarks at 2 (Oct. 9, 2003).  In the Remarks, the applicants made clear that Franco's "reservoir" structure distinguished it from the claims by virtue of that fact alone (i.e. being a reservoir, it is not macroscopically homogeneous throughout its entire volume), and not because "conventional lubricants" did not qualify as lipophilic substances.  *Id*. at 9; *cf.* Decl. 1, '720 patent, col. 1 ll.62-65; *see also* Decl. Ex. 2, '491 Application, Notice of Allowability (Apr. 5, 2004).  Therefore, there is no clear and unmistakable disavowal of claim scope here.  In addition, Dr. Sinko attested that a person of ordinary skill viewing the prosecution history would have also recognized that the patent applicants did not intend to surrender conventional lubricants.  Decl. Ex. 7, Sinko Report at ¶¶70-71.

I.     **Federal Circuit Law Compels Construing "Selected from the Group Consisting of" As An Exclusionary Term Specifying That An Element Contains Only What Is Expressly Set Forth In a Recited List, But Does Not Exclude Substances Unrelated To, Or Outside of the Context of Said Element**

The Court should adopt Plaintiffs' proposed construction[22] of the disputed phrase "selected from the group consisting of" because it comports with Federal Circuit precedent. This phrase is a term of art in patent law and should thus be construed in accordance with established Federal Circuit precedent. *See, e.g.*, *Conoco Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006); *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005) ("A Markush group lists specified alternatives in a patent claim, typically in the form: a member selected from the group consisting of A, B, and C.").

Although "consisting of . . . signif[ies] restriction and exclusion," (*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc*., 212 F.3d 1377, 1382 (Fed. Cir. 2000)), the "restriction is not absolute." *Conoco*, 460 F.3d at 1360. "[I]t does not limit aspects unrelated to the invention." *Norian Corp. v. Stryker Corp*., 363 F.3d 1321, 1331 (Fed. Cir. 2004).[23] Further, because "selected from the group consisting of" appears in clauses (a) and (b) of claim 1, and not in the preamble, the term limits only the elements set forth in each clause and does not exclude all other elements from the claim as a whole. *See Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1282 (Fed. Cir. 1986) ("The district court correctly observed that the phrase 'consisting of' appears in clause (a), not the preamble of the claim, and thus limits only the element set forth in clause (a).").

Here, the disputed phrase appears in both clauses as reciting a matrix that contains what is expressly set forth in the list of substances. That is, claim 1(a) states, "an inner lipophilic matrix consisting of substances selected from the group consisting of . . . ." Similarly, claim 1(b) states "said outer hydrophilic matrix consists of compounds selected from the group consisting of. . . ." In each context, "selected from the group consisting of" refers to the respective

---

[22] Plaintiffs propose the following construction: "an exclusionary term specifying that an element contains only what is expressly set forth in a recited list, but does not exclude substances unrelated to, or outside of the context of said element."

[23] Defendants' proposed construction, "an exclusionary term specifying that the element contains only what is expressly set forth in a recited list," does not account for this principle and should thus be rejected by the Court.

lipophilic or hydrophilic components.  The phrase is not, however, used in the preamble, and, therefore, does not limit or exclude other substances from the claimed oral pharmaceutical composition as a whole.  *See Mannesmann*, 793 F.2d at 1282.

Because Plaintiffs' proposed construction follows Federal Circuit precedent, the Court should construe "selected from the group consisting of" as an exclusionary term specifying that an element contains only what is expressly set forth in a recited list but does not exclude substances unrelated to, or outside of the context of the element.

## III.    CONCLUSION

For at least the reasons set forth above, the Court should adopt Plaintiffs' proposed constructions for the disputed claim terms of the '720 patent.

Dated this 19th day of November, 2012.   Respectfully submitted,

**s./ Martin J. Keane**

_____
W. Barry Blum / bblum@gjb-law.com
Florida Bar No.: 379301
Martin J. Keane / mkeane@gjb-law.com
Florida Bar No.: 524239
GENOVESE JOBLOVE & BATTISTA, P.A.
4400 Miami Tower
100 Southeast Second Street
Miami, Florida  33131
T: (305) 349-2300 / F: (305) 349-2310

Eric C. Christu / echristu@shutts.com
Florida Bar No.: 434647
Joseph R. Englander / jenglander@shutts.com
Florida Bar No.: 935565
SHUTTS & BOWEN LLP
525 Okeechobee Boulevard - Suite 1100
West Palm Beach, Florida  33401
T: (561)835-8500 / F: (561) 650-8530

Edgar H. Haug (*Pro Hac Vice*)
ehaug@flhlaw.com
Mark P. Walters (*Pro Hac Vice*)
mwalters@flhlaw.com
Andrew Wasson (*Pro Hac Vice*)
awasson@flhlaw.com
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
T: (212) 588-0888 / F: (212) 588-0500
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**s./ Martin J. Keane**

_____
Attorney

Janet T. Munn
Rasco Klock Reininger Perez Esquenazi Vigil & Nieto, P.L.
283 Catalonia Avenue - Suite 200
Coral Gables, Florida 33134
Telephone: (305) 476-7100
jmunn@rascoklock.com
*VIA CM-ECF*

James K. Stronski
Bruce D. DeRenzi
CROWELL & MORING LLP
590 Madison Avenue
New York, New York 10022
Telephone: (212) 223-4000
jstronski@crowell.com
bderenzi@crowell.com
*VIA CM-ECF*

Keith J. Harrison
Craig Lytle
Jennifer H. Burdman
Kristin Cooklin
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2533
kharrison@crowell.com
clytle@crowell.com
jburdman@crowell.com
kcooklin@crowell.com
*VIA CM-ECF*

**10904 – 001 / 255**