**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
CASE NO. 12-60862-CIV-MIDDLEBROOKS/BRANNON

SHIRE DEVELOPMENT LLC,
SHIRE PHARMACEUTICAL
DEVELOPMENT INC.,
COSMO TECHNOLOGIES LIMITED and
GIULIANI INTERNATIONAL LIMITED,

Plaintiffs,

v.

WATSON PHARMACEUTICALS, INC.,
WATSON LABORATORIES, INC. –
FLORIDA, WATSON PHARMA, INC., and
WATSON LABORATORIES, INC.,

Defendants.
_____/

**DEFENDANTS' MOTION TO EXCLUDE TESTING AND RELATED**
**OPINIONS ARISING FROM THE UNRELIABLE APPLICATION OF**
**MICROTOMY METHODS OF SAMPLE PREPARATION FOR THE PURPOSE OF**
**MAPPING THE LOCATION OF INGREDIENTS IN PHARMACEUTICAL TABLETS**

# TABLE OF CONTENTS

**Page**

I.     Introduction ................................................................................................................ 1

II.    Factual Background ................................................................................................... 2

     A.    A Summary of Dr. Bugay's Unreliable Application of Microtomy to
          Tablet Ingredient Mapping ........................................................................... 2

III.   Argument .................................................................................................................. 5

     A.    Dr. Bugay's Application of Microtoming To Pharmaceutical Tablet
          Mapping Experiments is Unreliable and Should be Excluded Under
          *Daubert* ....................................................................................................... 5

     B.    The Scientific Literature Demonstrates Inherent Risks In Dr. Bugay's
          Methodology In Microtoming Pharmaceutical Tablets for Mapping and
          Demonstrates That It Has Not "Attained General Acceptance Within The
          Scientific Community." ................................................................................ 6

     C.    The Few References Proffered by Plaintiffs Fail to Establish the
          Reliability of Dr. Bugay's Method Under *Daubert*. ............................... 10

     D.    Dr. Bugay's Method Should Be Excluded For The Further Reason That It
          Was Not Validated, The Method Cannot Be Tested, The Error Rate Is
          Unknown And Thus the Effect of Microtoming On Results Is Not Known. ....... 12

     E.    Plaintiffs' Expert's Opinions Relying on Dr. Bugay's Testing Must Also
          Be Stricken as Unreliable .......................................................................... 14

IV.   Conclusion .............................................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) ...................................................................6

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. Oct. 16, 2002).....................................13

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................... *passim*

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
    609 F.3d 1183 (11th Cir. 2010) ...................................................................6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)...................................................................................6

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) .................................................................10

*Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc.*,
    282 F.R.D. 655 (M.D. Fla. June 4, 2012) ...................................... *passim*

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ..............................................................6, 14

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
    862 F. Supp. 2d 1322 (S.D. Fla. Apr. 17, 2012) (Middlebrooks, J.) ......................................12

**RULES**

Fed. R. Evid. 702 ..................................................................................1, 5

## I.     Introduction

Watson[1] moves under *Daubert*[2] and Fed. R. Evid. 702 to exclude unreliable scientific testing and related testimony.  Specifically, Plaintiffs' expert, Dr. David E. Bugay, conducted an experiment attempting to show the spatial distribution (i.e., "mapping"), within Watson's tablet, of certain components relevant to the infringement issue.  Dr. Bugay's testing purportedly shows that magnesium stearate, sodium starch glycolate ("SSG") and mesalamine are uniformly distributed throughout a cross-section of Watson's tablet.  Dr. Bugay employed a microtomy method to expose the analyzed cross-sectional surfaces of Watson's tablet.  Dr. Bugay's microtomy method is inherently unreliable for mapping the tablet components because it is known to disturb the distribution of the components whose precise location is intended to be mapped.  Indeed, the scientific literature warns that microtomy smears or otherwise distorts the surface location of material, especially on soft samples such as pharmaceutical tablets.  Dr. Bugay's microtomy method was not validated by any other method, or by the use of any control, that would show that it did not, in fact, create the very distribution of tablet components that was purportedly observed.  As such, Dr. Bugay's microtomy procedure to expose the analyzed cross-sections of Watson's tablet falls far short of the reliability indicia needed to admit scientific testing based thereon.  Accordingly, this evidence and the opinions based on it should be stricken.

---

[1] Actavis, Inc. (formerly known as Watson Pharmaceuticals, Inc.), Watson Laboratories, Inc. – Florida, Watson Pharma, Inc., and Watson Laboratories, Inc., (collectively "Defendants" or "Watson").

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## II.     Factual Background

### A.     A Summary of Dr. Bugay's Unreliable Application of Microtomy to Tablet Ingredient Mapping

To "map" the location of the active ingredient mesalamine, and the excipients SSG and magnesium stearate in Watson's tablet, Dr. Bugay exposed cross-sections of the finished Watson tablets using a procedure called "microtomy."  This involved slicing away microscopically thin pieces of the tablets to expose cross-sectional surfaces of the tablet at different depths.  Once exposed, these cross-sectional surfaces were analyzed using a scanning electron microscope ("SEM") and Energy Dispersive X-Ray ("EDX")[3] to determine the spatial distribution of SSG and magnesium stearate.  (Ex. A, Declaration of Kristin Cooklin, Ex. 1, Bugay Dep. 157:3-17.)[4] Dr. Bugay subjected these same microtomy-prepared surfaces to "Raman Spectroscopy," for determination of the spatial distribution of mesalamine.  (Ex. 2, Bugay Report at p. 19, 27.)

The microtomy or microtoming procedure employed by Dr. Bugay involved the repeated slicing away of between 1 to 10 micron (μ) thicknesses of the tablet to reach a desired depth. (For context, 1μ is equal to 1/1000[th] of a millimeter.).  (Ex. 1, Bugay Dep. 171:20-172:4.)  This repeated slicing effectively polishes the surface of the tablet.  In fact, the scientific literature warns that microtoming can smear or disrupt a surface and, therefore, alter the location of excipients by the mere act of cutting.  Numerous publications recognize this risk, which is of special concern with magnesium stearate since it is used specifically as a lubricant, and is "buttery" and "greasy" and easily spreadable.  (Ex. 3, Sinko Decl. in Opp'n to Watson Summ. J.

---

[3] Hereinafter, this testing for will be referred to as "SEM/EDX" testing or analysis.

[4] The Cooklin Declaration is attached as Exhibit A to the Notice of Filing the Cooklin Declaration.  All subsequent references to Exhibits are to the numbered exhibits to the Cooklin Declaration unless otherwise identified.

Mot. at ¶¶ 15, 17.)  The published literature teaches that "microtoming . . .  is not easy for most pharmaceutical tablets," and *expressly warns* that the procedure can lead to "actual distribution of different components."   (Ex. 4, K. L. Andrew Chan et al., *Applications of Attenuated Total Reflection Infrared Spectroscopic Imaging to Pharmaceutical Formulations*, 75 Analytical Chemistry 9, 2140-46, 2141 (May 1, 2003).)  One study specifically *declined* to use microtoming in examining pharmaceutical tablets so as to effectuate the measurements in a "non-destructive way."  (Ex. 5, Claire Gendre, et al., *Comprehensive Study Of Dynamic Curing Effect On Tablet Coating Structure*, 81 European Journal of Pharmaceutics and Biopharmaceuticals, 657-665, 663 (2012).)

Dr. Bugay ignored the literature warnings and microtomed two Watson tablets in preparing cross-sections of the Watson tablets for analysis by SEM/EDX testing and Raman Spectroscopy.  (Ex. 1, Bugay Dep. 158:2-7, 157:5-12; Ex. 2, Bugay Report at p. 20.)  An oval-shaped Watson tablet was adhered by epoxy[5] to an "aluminum stub."  The mounted tablet was attached to a shaft in desired orientations.  The tablets were then left in the epoxy to "cure overnight at ambient temperatures."   (Ex. 6, Bugay Lab Notebook, BUGAY00000016-00000017.)  The secured tablets were then subjected to microtoming.  In a rotary microtome such as the one used by Dr. Bugay, the knife first approaches the tablet at an angle, slices into the tablet at a given thickness, cuts away that specific thickness of the tablet, and then retreats back to begin another cut of the tablet, of the same thickness.   The microtome will proceed automatically to cut at a pre-selected thickness, for a desired number of cuts.  (Ex. 1, Bugay Dep. 246:19-248:21.)

---

[5] Loctite® QuickSet 5-minute epoxy

In this manner, the first tablet was cut by the microtome a total of 170 times to four different depths: The first 70 cuts, or "passes," were done in increments of 10µ, using a stainless steel blade, revealing a surface depth of 700µ.  (Ex. 6, BUGAY00000018.)  The next set of 40 passes was done in increments of 5µ, with a "new" stainless steel knife of the same kind, exposing the surface at a depth of 900µ.  (*Id*.)  The third set of 50 passes was done in increments of 2µ, again with a "new" stainless steel knife of the same kind, giving rise to a deeper sample depth of 1000µ.  (*Id.*)  There was a final set of 10 passes done in increments of 1µ using a "Diamond High Profile" knife.  (*Id.*; Ex. 2, Bugay Report at p. 20.)  The cross-sections exposed at 700µ, 900µ, and 1000µ were subject to SEM/EDX and Raman analysis.  The second tablet was microtomed using only a Diamond High Profile knife to expose cross-sections at depths of 1050µ, 1770µ, and 1820µ.  (Ex. 6, BUGAY00000020.)

After each microtome cut, "the knife blade was cleaned," removing "debris material . . . from the sample/blade by a light stream of air" and by the application of a polystyrol (Styrofoam-like) rod dipped in alcohol.  (Ex. 2, Bugay Report at p. 21; Ex. 1, Bugay Dep. 249:19-21; Ex. 6, BUGAY00000014.)  Dr. Bugay did this cleaning due to a concern of "cross-contamination," (Ex. 1, Bugay Dep. 244:22), to ensure that no material from one cut was still remaining on the knife when it applied the following cut.  (*Id.* at 245:3-7.)  Dr. Bugay acknowledged the reason for the perceived risk: "We're dealing with a soft organic and a stainless steel or diamond blade that cuts through those organics."  (*Id.* at 245:20-22.)  Significantly, Dr. Bugay even conceded that "smearing" of a microtomed sample is a "concern[]" if someone doesn't properly perform a cutting procedure."  (*Id.* at 253:12-13.)  Yet, Dr. Bugay provided no data to validate that he "properly perform[ed]" this procedure thus ruling out the possibility that his own samples could have been thusly "smeared," disrupting the spatial

4

distribution of mesalamine, SSG and magnesium stearate therein.  (*Id.* at 259:4-19; 264:6-14.)
Nor did Dr. Bugay make any attempt to analyze the swabs that were used to wipe off the knife
blades; those were simply disposed of without any determination of the extent of smearing
during sample preparation. (*Id.* at 258:9-17, 262:25-263:5.)

Dr. Bugay subjected the six exposed cross-sections (three depths in each of two tablets)
to SEM/EDX to analyze the "spatial distribution" of SSG and magnesium stearate.  (Ex. 2,
Bugay Report at p. 16.)  After the SEM imaging, each cross-section was subjected to EDX
analysis, involving irradiation of the sample surfaces with "high-energy electrons to produce an
EDX spectrum."  (*Id.*)  EDX yields an "elemental map," enabling one to ascertain the spatial
distribution of the elements in question on the surface exposed by microtoming.  (*Id.*; Ex. 1,
Bugay Dep. 157:3-24.)  The same exposed sample surfaces were also subject to Raman
Spectroscopy, "a highly-sensitive analytical technique . . . [that can] be used to identify chemical
components in particular locations of a sample" by examining the distinct vibrational frequencies
given off by a specific compound, to determine the location of mesalamine.  (Ex. 2, Bugay
Report at pp. 17-18.)

Dr. Bugay relied on only this testing to support his opinion that mesalamine, SSG and
magnesium stearate were homogeneously distributed throughout the analyzed cross-sections.  He
did nothing to confirm that his microtomy procedure did not, in fact, disrupt the very distribution
of tablet components that his techniques were intended to ascertain.

## III.    Argument

### A.    Dr. Bugay's Application of Microtoming To Pharmaceutical Tablet Mapping Experiments is Unreliable and Should be Excluded Under *Daubert*

To assess the reliability—and admissibility—of scientific testing and related opinions
under Fed. R. Evid. 702, this Court should evaluate, *inter alia*, four factors: "(1) whether the

theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *Daubert,* 509 U.S. at 593-94); *Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 666 (M.D. Fla. June 4, 2012) ("[D]istrict courts must conduct 'an exacting analysis of the *foundations* of expert opinions.'") (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)) (emphasis in original).  Expert testimony is admissible only if "the methodology by which the expert reaches his conclusions *is* sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*."  *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (citations omitted) (emphasis added).  As the proponent of Dr. Bugay's testing, Shire bears the burden of demonstrating that it satisfies the reliability indicia of *Daubert* or that the application of microtomy to pharmaceutical tablet mapping represents a procedure that would make it "of a kind that others in the field would recognize as acceptable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999); *Rembrandt Vision Technologies*, 282 F.R.D. at 666 ("[The] proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and must be shown by a preponderance of the evidence.").

    **B.**    **The Scientific Literature Demonstrates Inherent Risks In Dr. Bugay's Methodology In Microtoming Pharmaceutical Tablets for Mapping and Demonstrates That It Has Not "Attained General Acceptance Within The Scientific Community."**

Dr. Bugay's application of microtomy to prepare cross-sectional samples of Watson's tablets for determining the spatial distribution of SSG, magnesium stearate and mesalamine is not in the scientific literature; nor did Dr. Bugay account for the numerous risks that the literature warns against.  *See Allison*, 184 F.3d at 1313 ("Peer review is significant under

*Daubert* because 'scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected.'" (citations omitted)).

To ensure that dependable results are obtained from microtoming, the scientific literature teaches that the "angle" and "temperature" at which an item is to be microtomed are significant. (*See* Ex. 7, John Scheirs, Compositional and Failure Analysis of Polymers: A Practical Approach 33, 47-49 (Wiley, 2000).)   The scientific literature recognizes that the angle at which the microtome knife cuts a sample is especially important in minimizing "[a]rtifacts that can be created by microtoming . . . ."   (*Id.* at 49.)   Additionally, the literature encourages freezing samples and microtoming at lower, "cryogenic" temperatures to minimize artifacts, especially when dealing with "material [that] is too soft."   (*Id.* at 52; *see also* Ex. 8, Matt J. Kipper, et al., *Design Of An Injectable System Based On Bioerodible Polyanhydride Microspheres For Sustained Drug Delivery*, 23 Biomaterials 4405-4412, 4408 (2002) (applying microtomy to polymers only at negative 20° C).)   Dr. Bugay apparently did his work at room temperature (approximately 37° C), since no other temperature is noted in his lab notebook, and neither his expert report nor his laboratory notebook evidence any steps taken to address the known risks of artifact introduction.

These risks were specifically known in the context of microtoming pharmaceutical tablets: "microtoming . . . is not easy for most pharmaceutical tablets, [necessitating the need for "high pressure" techniques for microtoming, resulting in] alter[ations] of the structure of the tablet and hence the actual distribution of different components."   (Ex. 4, Chan, et al., at 2141; *see also* Ex. 5, Gendre, et al., at 663 (declining to use microtoming to conduct measurements on tablets so as to "carr[y] out" the measurements in a "non-destructive way."); Ex. 9, A. Janet

Hoogstraate & Harry E. Bodde, *Methods for Assessing the Buccal Mucosa as a Route of Drug Delivery*, 12 Advanced Drug Delivery Reviews 99-125, 112 (1993) (explaining that even when using microtoming in its traditional setting with biological samples, "redistribution . . . and tissue damage" can occur); Ex. 10, V.M. Walley, et al., *Foreign Materials Found in the Cardiovascular System After Instrumentation or Surgery (Including A Guide To Their Light Microscopic Identification)*, 2 Cardiovasc. Pathol. 3, 157-185, 181 (July-Sept. 1993) ("material may even be 'dragged' by the microtome blade and displaced . . . .").)

Dr. Bugay's experimental results are not reliable in the face of numerous literature warnings of microtomy causing redistribution of sample components. Dr. Bugay has presented no evidence to establish that his microtomy procedure did not cause movement of the tablet components in a manner that may have actually created the uniform distribution his testing purports to show. *See Rembrandt Vision Technologies*, 282 F.R.D. at 666-67 (excluding plaintiff's expert's methodology and testing for failure to keep adequate records and because the expert cut samples where it was known and published that such cutting may affect results.).

Dr. Bugay even knew of these risks inherent in microtomy. Indeed, an article cited by Dr. Bugay in his expert report warns of the risk of "significant structural damage" present when using microtomy. In the context of that article, however, microtomy may have been more appropriate, in spite of this risk, because the author was not attempting there to map the precise spatial distribution of components. Thus, any risk in structural damage or redistribution of components was not as potentially significant. (Ex. 11, H.G. Shi, et al., *Characterization of Crystalline Drug Nanoparticles Using Atomic Force Microscopy and Complementary*

*Techniques*, 20 Pharm. Res. 3, 479-484, 481 (2003).[6])  It follows that to appropriately use microtomy to map the distribution of tablet components, Dr. Bugay should have provided some confirmatory evidence that the observed "homogenous distribution" of SSG and magnesium stearate, for example, was not in fact an artifact of the very method he used to prepare the analyzed cross-sections.

Dr. Bugay twice conceded when deposed that Watson's ANDA product is a "soft organic" material.  (Ex. 1, Bugay Dep. 245:20-21, 263:25.)  Additionally, another one of Plaintiffs' experts, Dr. Patrick Sinko, described magnesium stearate—one of the tablet ingredients being mapped—variously as "buttery," (Ex. 3, Sinko Decl. in Opp'n to Watson Summ. J. Mot. at ¶15), and as being "'greasy to the touch' and . . . 'readily adhere[nt] to the skin.'"  (Ex. 12, Sinko Report ¶ 80 (citing HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 280 (2d ed. 1994).)  It would not be surprising that a "soft," "greasy" and "buttery" substance, like magnesium stearate, would be uniformly smeared by a sharp microtome blade repeatedly applied at high pressure across a surface to cut to a desired cross-sectional depth within the tablet.  The relevant scientific literature makes clear that such surface smearing is a significant concern that could easily have resulted in the apparent "homogenous" distribution of magnesium stearate and

---

[6]The Shi article does not concern sample preparation of a tablet matrix for the purpose of mapping or identifying the specific location of excipients in that matrix.  It also does not concern the use of these techniques on samples comprised of multiple ingredients—including buttery or greasy excipients such as magnesium stearate —that are subject to smearing when cut.  Instead, the article describes the preparation of a single substance in the physical form of hard, crystalline nanoparticles, to determine the different sizes and shapes of particles present—*not* their spatial distribution in a tablet or other media.  (*Id*. at 480.)  The article describes the use of an "ultramicrotome," whereas Dr. Bugay used a "rotary microtome."  (*Id*.; Ex. 2, Bugay Report at p. 20; Ex. 6, BUGAY00000014.)  These are two different devices, with different applications and results.  Therefore, Dr. Bugay's reliance on this article to validate his methodology is inappropriate.

SSG that Dr. Bugay purportedly observed.  The literature itself makes clear that Dr. Bugay's methodology was unreliable.

Dr. Bugay's cleaning of the microtome blade between cuts as a "precautionary measure [or "step"]" to remove debris (Ex. 1, Bugay Dep. 249:13, 251:7, 258:20, 263:24; Ex. 2, Bugay Report at p. 21), underscores that the microtomy procedure disrupts the location of tablet components that, in fact, comprise that debris.  Certainly, if tablet components remain on the blade, they are also smeared on the exposed tablet surface.  Wiping the microtome blade between cuts would do nothing to mitigate the redistribution of components that has already occurred at the exposed surface of the tablet.  Moreover, the wipes used to clean the microtome blade were even discarded, *without any testing* that might have been relevant to determine the extent of smearing of magnesium stearate or other tablet ingredients by microtoming.  (Ex. 1, Bugay Dep. 258:9-17).

Dr. Bugay performed no testing to validate that his novel pharmaceutical tablet sample preparation did not alter, by smearing or otherwise, the spatial orientation of the tablet excipients.  Given this risk, Dr. Bugay's testing cannot reliably show the actual position of the excipients in a tablet cross-section prior to microtoming.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) ("A reliable methodology should take into account the background risk.").

Dr. Bugay simply ignored this serious risk of surface alteration, recognized in numerous articles and studies, in assessing the results of his spatial mapping experiments.  Accordingly, Dr. Bugay's SEM/EDX and Raman testing results, and all opinions based on those unreliable results should be excluded from evidence at trial.

     **C.**    **The Few References Proffered by Plaintiffs Fail to Establish the Reliability of Dr. Bugay's Method Under *Daubert*.**

In his expert report, Dr. Bugay asserts that the microtomy procedure used to obtain the Watson tablet surface samples "is a typical sample preparation procedure used" to analyze the "interior portion of a pharmaceutical product," (Ex. 2, Bugay Report at p. 21.)  Yet, neither in his expert report nor during his deposition, did Dr. Bugay proffer scientific literature supporting that his sample preparation technique is "typical."   In fact, when Plaintiffs were asked to provide literature supporting Dr. Bugay's methodology, they could only point to three allegedly supporting references, none of which actually supports the sample preparation method. (*Compare* Cooklin Decl. Ex. 13, *with* Ex. 14 (Plaintiff's response citing and attaching only three allegedly supporting references).)   Plaintiffs' reference to USP chapter <1181> discussing SEM/EDX is irrelevant as it has nothing to do with microtoming.  Watson does not allege that the SEM/EDX techniques, apart from the microtomy procedure, are inherently unreliable.   In fact, USP chapter <1181> does mention pre-analysis sample preparation but nowhere mentions the use of microtomy to prepare samples.

Plaintiffs also referenced an article entitled "Comparison of Embedding Methods Used in Examining Cross-Sections of Automotive Paints with Micro-Fourier Transform Infrared Spectroscopy."  Simply stated, this article provides no teaching relevant to using microtomy to expose cross-sections of a pharmaceutical tablet containing greasy excipients for ascertaining the spatial distribution of the tablet components.  Rather, the article discusses the use of microtomy on hardened automotive paints, and in particular discusses various "embedding methods" used to secure automotive paint samples to be microtomed.  (Ex. 15, W-T. Chang, T et al., *Comparison of Embedding Methods Used in Examining Cross-Sections of Automotive Paints with Micro-Fourier Transform Infrared Spectroscopy*, 1 Foren. Sci. J., 55-60, 55 (2002).)   Various "embedding methods" are wholly irrelevant to whether the surfaces of Watson's tablets exposed

by microtoming were disrupted during the procedure, giving rise to unreliable mapping of tablet components throughout an exposed cross-section. Notably, Plaintiffs avoid the far more relevant scientific literature that warns of the risks arising from microtoming pharmaceutical tablets.

Dr. Bugay's assertion that microtomy is "a technique that is a century old," (Ex. 1, Bugay Dep. 232:16-17), avoids the issue of its reliability in exposing a cross-section of a pharmaceutical tablet for spatial mapping of its components. Nowhere has Dr. Bugay established that his methodology is so well-accepted in the relevant scientific community that it can be safely relied upon, without peer testing or validation for this particular purpose. This type of misplaced reliance on a common method was similarly observed by this Court in *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322 (S.D. Fla. Apr. 17, 2012) (Middlebrooks, J.). In *Winn-Dixie*, this Court excluded plaintiff's expert's testimony based on an unsuitable "regression analysis." There, the Court explained that even though "regression analysis has long been accepted in the field of economics and in the courtroom, it was inadmissible because the expert's "analysis *for this case* ha[d] not been subjected to peer review." *Id.* at 1332-33 (emphasis added). Like the untested specific application of generally known regression analysis in *Winn-Dixie*, Dr. Bugay's novel testing based on microtoming to expose cross-sections of pharmaceutical tablets should be excluded from trial.

## D. Dr. Bugay's Method Should Be Excluded For The Further Reason That It Was Not Validated, The Method Cannot Be Tested, The Error Rate Is Unknown And Thus the Effect of Microtoming On Results Is Not Known.

The known risks of disrupting the spatial distribution of pharmaceutical tablet components by microtoming are sufficient alone to not admit this testing and the related opinions. Additional grounds under *Daubert* to exclude this testing arise from Dr. Bugay's failure, in the face of these known problems, to validate the SEM/EDX testing results to demonstrate whether the "homogenous distribution" of sodium starch glycolate and magnesium

stearate in Watson's ANDA Product, for example, was present in the tablet prior to subjecting it to microtoming.   Thus the method has not been tested to determine the extent to which microtomy contributes to the results, and therefore the error rate of the method is unknown.

When asked directly how he validated his test results in view of the known risk of component redistribution by microtoming, Dr. Bugay provided a dismissive circular response:

> Q.  What's been done to validate the method you used, to make sure that the results that you have are not the results of some kind of smearing of product, of magnesium stearate along the surface of the cut, [sic] that would then cover the cross-section of the granule as the plate makes the cut?
>
> A.  *The validation is in the actual data that we have.*
>
> (Ex. 1, Bugay Dep. 255:8-17.)

Dr. Bugay's response highlights the absence of the type of validation testing that other courts have found to support the admissibility of questioned expert testing.  *See, e.g., Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F. Supp. 2d 423, 494-95 (S.D.N.Y. Oct. 16, 2002) (finding that an expert's procedure and consequent results were admissible only because the expert had "utiliz[ed] numerous testing techniques to verify the results using different types of equipment, testing methods, and sampling techniques," establishing the "reproducibility and accuracy" of the methods).  Dr. Bugay has conducted no other testing to verify his SEM/EDX testing results, and in particular, no testing other than that utilizing microtoming.

Dr. Bugay failed to disclose in either his lab notebook or expert report certain parameters known to affect the microtoming process, making it difficult to reproduce the results he obtained. (Ex. 6, BUGAY00000001-00000034.)  As explained *supra* in section (III)(B), the specific angle at which a sample is microtomed, and the temperature at which it is cut, are both conditions significant to the quality of the sample achieved through microtoming.  While Dr. Bugay made a general reference to the blade angle, stating that "we have our blade position at an angle, with

respect to the tablet" (Ex. 1, Bugay Dep. 164:8-13), he did not disclose the angle at which he microtomed the tablet, nor is this information reported in his lab notebook.  (Ex. 6, BUGAY00000001-00000034.)  Similarly, Dr. Bugay did not provide the temperature at which he microtomed the Watson tablets.  The omission of important testing conditions and/or parameters, hindering reproducibility of expert testing, is a substantial factor against its admissibility.  *See supra* (III)(B); *see also Rembrandt Vision Technologies*, 282 F.R.D. at 667 ("[The expert's] testing, however, was not reproducible because he failed to document and disclose the procedures he used to conduct his tests.  This lack of documentation strongly weighs against the reliability of [the expert's] methodology." (citations omitted)).

Ultimately, Dr. Bugay has asserted, both in his report and deposition testimony, that his methods of microtomy, leading to the sample preparation for his SEM/EDX analysis, were reliable because of the results themselves.  When asked whether he was concerned about any smearing of the sample, leading to inaccurate results, Dr. Bugay dismissed any concern by stating that the images spoke for themselves: "examination of those data sets clearly show that there was no smearing of anything."  (Ex. 1, Bugay Dep. 254:20-22.)  But this type of self serving declaration cannot cure the lack of validation for this sample preparation technique because "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong."  *Frazier*, 387 F.3d at 1261.

### E.    Plaintiffs' Expert's Opinions Relying on Dr. Bugay's Testing Must Also Be Stricken as Unreliable.

Dr. Bugay's elemental mapping testing methodology as applied to pharmaceutical tablets is unreliable; therefore his and other Plaintiffs' Experts' opinions about it should be stricken. Plaintiffs' other expert witnesses, including Dr. Sinko, relied on Dr. Bugay's testing to opine that

the Watson ANDA product has a structure they contend is consistent with infringement.[7]  Dr. Sinko did no independent testing to determine the spatial distribution of SSG or magnesium stearate, and he admitted to relying solely on Dr. Bugay's testing for his opinions on the distribution of the excipients within the tablet structure.  (Ex. 12, Sinko Report at ¶¶ 62, 78, 94, 100.)  Dr. Sinko said that he uses mictotomy for testing of "*biological*" samples "all the time, looking at where different things go in cells . . . [a]dmittedly, the methods are different."  (Ex. 16, Sinko Dep. 192:20-24 (emphasis added).)  Notably, Dr. Sinko admitted that "this is the first time [he had] seen this type of data" on pharmaceutical tablets (*Id.* at 194:5-7.)  Accordingly, Dr. Sinko and any other of Plaintiffs' expert witnesses should similarly be excluded from relying on Dr. Bugay's testing in any opinion proffered at trial.  Additionally, Dr. Sinko conceded that he knew nothing about the use of microtoming on pharmaceutical tablets.  (Ex. 16, Sinko Dep. 193:2-194:11.)

IV.    **Conclusion**

For the reasons stated above, the underlying methodology comprising Shire's proposed expert testimony of Dr. Bugay on the results of his SEM/EDX and Raman spectra analyses does not meet *Daubert* standards and are unreliable.  This testimony and all opinions based in any part on these unreliable SEM/EDX and Raman test results should accordingly be excluded from trial.

---

[7] These unreliable SEM/EDX and Raman testing results would not support infringement, even if admitted, because they do not establish an infringing structure but instead purport to show the uniform distribution of magnesium stearate and SSG throughout the tablet and the absence of the required "inner lipophilic matrix " and "outer hydrophilic matrix."

Dated:  March 28, 2013                    Respectfully submitted,

                                          s/ James K. Stronski
                                          James K. Stronski*
                                          Email:  jstronski@crowell.com
                                          Bruce D. DeRenzi*
                                          Email:  bderenzi@crowell.com
                                          Crowell & Moring LLP
                                          590 Madison Avenue, 20th Floor
                                          New York, NY  10022-2544
                                          Phone: 212.895.4217
                                          Fax: 212.223.4134

                                          Kristin M. Cooklin*
                                          Email:  kcooklin@crowell.com
                                          Craig P. Lytle*
                                          Email:  clytle@crowell.com
                                          Crowell & Moring LLP
                                          1001 Pennsylvania Ave. NW
                                          Washington, DC  20004
                                          Phone: 202.624.2500
                                          Fax: 202.628.5116

                                          AND

                                          s/ Janet T. Munn
                                          Janet T. Munn, Fla. Bar No. 501281
                                          Email:  jmunn@rascoklock.com
                                          Rasco Klock
                                          283 Catalonia Avenue, Suite 200
                                          Coral Gables, FL  33134
                                          Phone:  305.476.7101
                                          Fax:  305.476.7102

                                          *Counsel for Defendants*

                                          *Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 28, 2013, pursuant to the Court's Order of March 28, 2013, [D.E. #198], I electronically re-filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.  I further certify that on March 26, 2013, a true and correct copy of the foregoing was filed under seal, via the conventional method and served via email on counsel for Plaintiffs.  Finally, I hereby certify that on March 15, 2013, by agreement of counsel, a true and correct copy of the foregoing was served via email by counsel for Defendants, Kristin M. Cooklin, Esq., on counsel for Plaintiffs.

Martin James Keane, Jr., Esq.
Email: mkeane@gjb-law.com
William Barry Blum, Esq.
Email:  bblum@gjb-law.com
Genovese Joblove & Battista
100 S.E. 2nd Street
Suite 4400
Miami, FL  33131

Daniel J. Barsky, Esq.
Email: dbarsky@shutts.com
Eric C. Christu, Esq.
Email: echristu@shutts.com
Shutts & Bowen LLP
525 Okeechobee Boulevard
Suite 1100
West Palm Beach, FL  33401

Edgar H. Haug, Esq.*
Email: ehaug@flhlaw.com
Elizabeth Murphy, Esq.*
Email: emurphy@flhlaw.com
Jason A. Lief. Esq.*
Email: jlief@flhlaw.com
Mark P. Walters, Esq.
Email: mwalters@flhlaw.com
Andrew Wasson, Esq.*
Email: awasson@flhlaw.com
Frommer Lawrence & Haug, LLP
745 Fifth Avenue
New York, NY  10151
*Counsel for Plaintiffs*

*Admitted Pro Hac Vice

s/ Janet T. Munn
_____
Janet T. Munn