# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

13-1409

SHIRE DEVELOPMENT, LLC,
SHIRE PHARMACEUTICAL DEVELOPMENT, INC.,
COSMO TECHNOLOGIES LIMITED, and
GIULIANI INTERNATIONAL LIMITED,

*Plaintiffs-Appellees,*

v.

WATSON PHARMACEUTICALS, INC. (now known as Actavis, Inc.),
WATSON LABORATORIES, INC. FLORIDA, WATSON PHARMA, INC. (now known as Actavis Pharma, Inc.), and WATSON LABORATORIES, INC.,

*Defendants-Appellants.*



FILED BY ABM Deputy Clerk
Jun 9, 2014
STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. MIAMI

Appeal from the United States District Court for the Southern District of Florida in No. 12-CV-60862, Judge Donald M. Middlebrooks.

## MANDATE

In accordance with the judgment of this Court, entered March 28, 2014, and pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure, the formal mandate is hereby issued.

FOR THE COURT

/s/ Daniel E. O'Toole
Daniel E. O'Toole
Clerk of Court

cc: Jonathan Edward Bachand
Clerk of Court, Southern District of Florida (Fort Lauderdale)
Kristin Marie Cooklin
Nicholas F. Giove
Edgar Haug
Jonathan A. Herstoff
Jason Aaron Lief
Steven Arthur Maddox
Neil Michael McCarthy
Elizabeth Murphy
Andrew S. Wasson

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## NOTICE OF ENTRY OF
## JUDGMENT ACCOMPANIED BY OPINION

OPINION FILED AND JUDGMENT ENTERED: 03/28/2014

The attached opinion announcing the judgment of the court in your case was filed and judgment was entered on the date indicated above. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

No costs were taxed in this appeal.

Regarding exhibits and visual aids: Your attention is directed Fed. R. App. P. 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

FOR THE COURT

/s/ Daniel E. O'Toole
Daniel E. O'Toole
Clerk of Court

cc: Jonathan Edward Bachand
Kristin Marie Cooklin
Nicholas F. Giove
Edgar Haug
Jonathan A. Herstoff
Jason Aaron Lief
Steven Arthur Maddox
Neil Michael McCarthy
Elizabeth Murphy
Andrew S. Wasson

13-1409 - Shire Development, LLC v. Watson Pharmaceuticals, Inc.
United States District Court for the Southern District of Florida, Case No. 12-CV-60862

# United States Court of Appeals for the Federal Circuit

_____

**SHIRE DEVELOPMENT, LLC,
SHIRE PHARMACEUTICAL DEVELOPMENT, INC.,
COSMO TECHNOLOGIES LIMITED,** AND
**GIULIANI INTERNATIONAL LIMITED,**
*Plaintiffs-Appellees,*

v.

**WATSON PHARMACEUTICALS, INC.
(now known as Actavis, Inc.), WATSON
LABORATORIES, INC. FLORIDA, WATSON
PHARMA, INC. (now known as Actavis Pharma,
Inc.),** AND **WATSON LABORATORIES, INC.,**
*Defendants-Appellants.*

_____

2013-1409
_____

Appeal from the United States District Court for the Southern District of Florida in No. 12-CV-60862, Judge Donald M. Middlebrooks.

_____

Decided: March 28, 2014
_____

EDGAR H. HAUG, Frommer Lawrence & Haug, LLP, of New York, New York, argued for plaintiffs-appellees. With him on the brief were JASON A. LIEF, ANDREW S. WASSON, NICHOLAS F. GIOVE, ELIZABETH MURPHY, and JONATHAN A. HERSTOFF.

2       SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.

STEVEN A. MADDOX, Knobbe, Martens, Olson & Bear, LLP, of Washington, DC, argued for defendants-appellants. With him on the brief were JONATHAN E. BACHAND and NEIL M. MCCARTHY. Of counsel was KRISTIN MARIE COOKLIN, Crowell & Moring, LLP, of Washington, DC.

---

Before RADER, *Chief Judge,* PROST and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

The plaintiffs-appellees (collectively, Shire) own U.S. Patent No. 6,773,720, which claims a controlled-release oral pharmaceutical composition for treating inflammatory bowel diseases. Shire markets these oral pharmaceutical compositions under the brand name LIALDA®. After the defendants-appellants (collectively, Watson) submitted an Abbreviated New Drug Application (ANDA) seeking approval to sell the bioequivalent of LIALDA®, Shire sued for infringement of the '720 patent. After construing certain relevant claim language, the district court found that Watson's product infringed the '720 patent. We conclude that the district court's constructions of "inner lipophilic matrix" and "outer hydrophilic matrix" impermissibly broaden the ordinary meaning of the terms. Accordingly, we *reverse* the district court's claim constructions of "inner lipophilic matrix" and "outer hydrophilic matrix," and subsequent finding of infringement, and *remand* for further proceedings consistent with this opinion.

I.

The '720 patent—entitled "Mesalazine Controlled Release Oral Pharmaceutical Composition"—concerns controlled-release oral pharmaceutical compositions for treating inflammatory bowel diseases, such as Crohn's

SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.     3

disease and ulcerative colitis. '720 patent col. 1 ll. 9–13. The active ingredient in these compositions is 5-aminosalicylic acid, which is also known as mesalazine or mesalamine (hereinafter, mesalamine). Mesalamine treats inflamed areas in the bowel by direct contact with the intestinal mucosal tissue. J.A. 9054. Thus, mesalamine must pass through the stomach and small intestine without being absorbed into the bloodstream. J.A. 9054. And, it must be administered throughout the entire length of the colon so that the mesalamine contacts all affected tissues. J.A. 9054. Given these requirements, the oral composition must contain a high percentage, by weight, of mesalamine. '720 patent col. 3 ll. 52–56.

The '720 patent teaches an inner lipophilic matrix and an outer hydrophilic matrix to address the limitations of the prior art systems.[1] According to the '720 patent, the combination of a lipophilic and hydrophilic matrix in an inner-outer matrix system, respectively, is advantageous because the inner-outer matrix properties cause the mesalamine to be released in a sustained and uniform manner. '720 patent col. 3 ll. 57–59 ("[T]he compositions of the invention provide a release profile of [mesalamine] more homogenous than the traditional systems."); *see also* col. 3 l. 60–col. 4 l. 5. The '720 patent also teaches the "advantageous characteristic" of a composition with up to 95% active ingredient by weight. '720 patent col. 3 ll. 52–56.

Shire asserts independent claim 1 and dependent claim 3. Claim 1 recites:

---

[1] Generally, a lipophilic substance has an affinity for lipids and a hydrophilic substance has an affinity for water. Thus, a lipophilic substance resists dissolving in water, but a hydrophilic substance readily dissolves in water. *See* '720 patent col. 1 ll. 17–26, 32–36.

4	SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.

> 1. Controlled-release oral pharmaceutical compositions containing as an active ingredient 5-amino-salicylic acid, comprising:
>
>> a) an inner lipophilic matrix consisting of substances selected from the group consisting of unsaturated and/or hydrogenated fatty acid, salts, esters or amides thereof, fatty acid mono-, di- or triglycerid[e]s, waxes, ceramides, and cholesterol derivatives with melting points below 90° C., and wherein the active ingredient is dispersed both in said the lipophilic matrix and in the hydrophilic matrix;
>>
>> b) an outer hydrophilic matrix wherein the lipophilic matrix is dispersed, and said outer hydrophilic matrix consists of compounds selected from the group consisting of polymers or copolymers of acrylic or methacrylic acid, alkylvinyl polymers, hydroxyalkyl celluloses, carboxyalkyl celluloses, polysaccharides, dextrins, pectins, starches and derivatives, alginic acid, and natural or synthetic gums;
>>
>> c) optionally other excipients;
>
> wherein the active ingredient is present in an amount of 80 to 95% by weight of the total composition, and wherein the active ingredient is dispersed both in the lipophilic matrix and in the hydrophilic matrix.

'720 patent col. 6 ll. 7–30. Claim 3 depends from claim 1 and requires that the composition be in the form of tablets, capsules, or minitablets. '720 patent col. 6 ll. 35–36.

The '720 patent teaches a three-step process to arrive at the claimed composition. '720 patent col. 2 ll. 48–59.

SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.   5

First, one or more low melting, lipophilic excipients[2] are mixed with mesalamine during heating. '720 patent col. 2 ll. 50–53. Second, the mixture is cooled to form the lipophilic matrix and then reduced in size into "matrix granules containing the active ingredient." '720 patent col. 2 ll. 54–56. Third, the lipophilic matrix granules are mixed together with hydrophilic excipients and compressed to form tablets. '720 patent col. 2 ll. 50–53, col. 3 ll. 40–45.

During prosecution of the '720 patent, the examiner initially rejected the applicants' claims as obvious in view of GB 2 245 492 A (Franco); obvious and anticipated in view of U.S. Patent No. 5,593,690 (Akiyama); and obvious in view of the combination of U.S. Patent No. 5,851,555 (Sanghvi) and U.S. Patent No. 6,395,300 (Straub). J.A. 15469–71. The examiner explained that Franco taught a pharmaceutical composition with an active core, a lipophilic coating, and a hydrophilic film. J.A. 15469.

In response, the applicants stated that Franco disclosed a reservoir system where "the active ingredient is confined within a core which acts as a reservoir from which the active ingredient is released via the erosion of the outer coating. However, as to the present invention, the active ingredient is dispersed in a lipophilic matrix, not in an isolated core." J.A. 15480–81.

The applicants then distinguished Akiyama based on the claimed invention's two matrices and high active ingredient concentration. The applicants argued that Akiyama "fail[s] to disclose or suggest the two matrices and the arrangement of the matrices as set forth in the

---

[2] An excipient is an ingredient other than the active ingredient, i.e., an ingredient other than mesalamine. *See Shire Dev. LLC v. Watson Pharm., Inc.*, No. 12-60862, 2013 WL 1912208, at *6 (S.D. Fla. May 9, 2013); *see also* J.A. 1425.

claimed invention. The arrangement of the matrices in the present invention aid[s] in the combined release of an active ingredient via diffusion from a lipophilic matrix." J.A. 15479. The applicants also argued that Akiyama's composition contained the "active ingredient . . . in an amount much lower than that according to the claimed invention:"—Akiyama taught an active ingredient in granules in an amount ranging from 0.005–75% by weight, but the applicants' amended claim taught 80–95%. J.A. 15478–79.

To distinguish Sanghvi and Straub, the applicants again focused on a lack of two separate matrices: Sanghvi "fails to disclose a system containing two separate matrices. [It] merely discloses formulations obtained by mixing together hydrophilic and lipophilic substances into a single matrix." J.A. 15481. When discussing the combination of Sanghvi and Straub, the applicants explained that "[w]hile the publications might teach the advantageous results of using a lipophilic matrix, the publications fail to disclose or suggest a composition comprising a combination of two separate matrices. In fact, there is no mention or suggestion of a composition utilizing different control mechanisms." J.A. 15482.

The examiner maintained her rejection of the pending claims as obvious in view of Franco. The examiner also rejected the claims because "the feature upon which applicant relies (i.e., the active ingredient is dispersed in a lipophilic matrix) is not recited in the rejected claims." J.A. 15489. Further, the examiner explained that the limitation-at-the-time—"active ingredient is at least partly inglobated"—"does not limit the claim to 'active ingredient is dispersed in a lipophilic matrix' as alleged by the applicant." J.A. 15489.

In response, the applicants maintained that Franco taught a reservoir system, but that the claimed invention "relates to a 'multimatrix system' and not to a reservoir

SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC. 7

system." J.A. 15492; *see also* J.A. 15492 ("FRANCO et al. do[es] not teach an inner lipophilic matrix or an outer hydrophilic matrix . . . . The composition taught by FRANCO et al. is not based on an actual matrix."). The applicants also amended their claims to state that the active ingredient is dispersed in the lipophilic matrix and added a Markush group[3] for both the inner lipophilic matrix and the outer hydrophilic matrix. J.A. 15491–92, 96, 99. Following an interview with the examiner, the claims were amended to require the mesalamine to be dispersed in the outer hydrophilic matrix and not just the lipophilic matrix. J.A. 15546–50. The claims were then allowed and the '720 patent issued.

When Watson submitted its ANDA seeking FDA approval to sell the bioequivalent of LIALDA®, Shire sued Watson for infringement of the '720 patent. In January 2013, the district court construed several disputed terms, including "inner lipophilic matrix" and "outer hydrophilic matrix." *See Shire Dev. LLC v. Watson Pharm., Inc.*, No. 12-60862, 2013 WL 174843 (S.D. Fla. Jan. 17, 2013).

The district court held a bench trial in April 2013 and issued its opinion a month later, finding that Watson's ANDA product infringed claims 1 and 3 of the '720 patent; that the claims were not invalid under 35 U.S.C. § 112, ¶ 1; and that Shire was entitled to injunctive relief. *Shire Dev. LLC v. Watson Pharm., Inc.*, No. 12-60862, 2013 WL 1912208, at *16 (S.D. Fla. May 9, 2013). Specifically, the district court determined that Watson's ANDA product met the limitations of the claims at issue. In considering

---

[3] "A Markush group lists specified alternatives in a patent claim, typically in the form: a member selected from the group consisting of A, B, and C." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005) (citing to *Manual of Patent Examining Procedure* § 803.2 (2004)).

Case 0:12-cv-60862-DMM Document 267-2 Entered on FLSD Docket 08/28/2014 Page 10 of 19
Case: 13-1409    Document: 55    Page: 10    Filed: 03/28/2014

8    SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.

the disputed limitations, the district court found that the mesalamine in Watson's product was dispersed in both the lipophilic and hydrophilic matrices because the mesalamine was present in both the granules and the spaces outside the granules. *Shire*, 2013 WL 1912208, at *7–13. The district court also determined that Watson failed to prove by clear and convincing evidence that the patent was invalid under 35 U.S.C. § 112 for lack of written description or enablement. *Id.*, at *14–16. Watson now appeals issues of claim construction, infringement, and invalidity. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).

II.

Claim construction is an issue of law reviewed de novo. *Lighting Ballast Control LLC v. Philips Elecs. N.A. Corp.*, No. 2012-1014, 2014 WL 667499, at *1 (Fed. Cir. Feb. 21, 2014) (en banc); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). When construing asserted claims, claim terms are given "their ordinary and accustomed meaning as understood by one of ordinary skill in the art." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

Intrinsic evidence, such as "the specification, . . . may shed contextual light" on the ordinary and customary meaning of a claim term. *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316.

In addition to the specification, this court looks to the prosecution history. For example, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches

Case 0:12-cv-60862-DMM Document 255 Entered on FLSD Docket 08/28/2014 Page 11 of 19
Case: 13-1409    Document: 67-2    Page: 9    Filed: 03/28/2014  (12 of 18)

SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.

9

and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003); *see Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover [and] he is by implication surrendering such protection."). "However, while the prosecution history can inform whether the inventor limited the claim scope in the course of prosecution, it often produces ambiguities created by ongoing negotiations between the inventor and the PTO. Therefore, the doctrine of prosecution disclaimer only applies to unambiguous disavowals." *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) (citing *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1289 (Fed. Cir. 2009)). This court reviews the application of prosecution disclaimer de novo. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009).

### III.

The district court construed "inner lipophilic matrix" to mean "a matrix including at least one lipophilic excipient, where the matrix is located within one or more substances." *Shire*, 2013 WL 174843, at *5. Similarly, the district court construed "outer hydrophilic matrix" as "a matrix of at least one hydrophilic excipient, where the matrix is located outside the inner lipophilic matrix." *Id.* These constructions do not reflect the ordinary and customary meaning of the claim terms in light of the evidence and are impermissibly broad.

### A.

When construing the disputed terms, the district court relied on the specification to first construe "matrix" to mean "a macroscopically homogeneous structure in all its volume." *Id.*, at *4 (quoting '720 patent col. 3 ll. 42–45). That construction is correct. But the district court erred by construing "'lipophilic matrix' [as] a matrix that

10     SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.

includes at least one lipophilic excipient." *Id.* That construction erroneously focuses on the lipophilic properties of an excipient in the matrix, rather than the properties of the matrix itself.

A review of the intrinsic evidence as a whole reveals that the district court's construction of "inner lipophilic matrix"—and thus, "outer hydrophilic matrix"—is overly broad. Looking first to the language of the claims, "lipophilic" is an adjective that modifies matrix. The parties stipulated that "lipophilic" means "poor affinity towards aqueous fluids." J.A. 216. Thus, the *matrix*—not just an excipient within the matrix—must exhibit the stipulated-to lipophilic characteristic.

This conclusion is bolstered by the specification. The Background of the Invention explains that a lipophilic matrix is one "in which the main component of the matrix structure" exhibits certain lipophilic properties. '720 patent col. 1 ll. 17–20. And, the specification teaches that a lipophilic matrix "generally entail[s] non-linear, but esponential [sic] release of the active ingredient." '720 patent col. 1 ll. 32–33. Thus, a "lipophilic *matrix*" is more than just a matrix with at least one lipophilic *excipient*—the matrix itself must exhibit lipophilic characteristics. The '720 patent teaches that this occurs when "the main component of the matrix structure" is lipophilic. '720 patent col. 1 ll. 17–18.

B.

In construing the matrix terms, the district court rejected Watson's position that the inner matrix and outer matrix must be "separate and distinct." *Shire*, 2013 WL 174843, at *5. Watson based its arguments on alleged disclaimers by the applicants during the prosecution. *See* Appellants' Br. 37–38. The district court acknowledged that the applicants described their matrices as "separate" to distinguish over the prior art references, but found that "no where in the prosecution history, claims, or specifica-

SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.   11

tion does the term 'separate and distinct' appear." *Shire*, 2013 WL 174843, at *5. Explaining that the prosecution history is an ongoing negotiation and that there must be clear and unambiguous disavowal, the district court could not "say that the claim was clearly limited or disclaimed during the prosecution." *Id.*

The district court correctly found no prosecution disclaimer because the statements in the prosecution history were not "unambiguous disavowals." *Grober*, 686 F.3d at 1341. During prosecution, Shire carefully characterized the *prior art* as *not having* separate matrices but never actually stated that the *claimed invention does have* separate matrices. *See, e.g.*, J.A. 15482 ("While the publications might teach the advantageous results of using a lipophilic matrix, *the publications fail to disclose* or suggest a composition comprising a combination of two separate matrices." (emphasis added)). Although the prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction.

The prosecution history, the structure of the claim itself, the ordinary meaning of the claim terms, including the Markush group limitations, and the patent's description of the invention compel a claim construction which requires that the inner lipophilic matrix is separate from the outer hydrophilic matrix. *Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

Looking to the claim structure itself, the claims require the inner lipophilic matrix to be separate, if not distinct, from the outer hydrophilic matrix. Element (a) of claim 1 recites "an inner lipophilic matrix." Element (b) of claim 1 separately recites "an outer hydrophobic matrix." The separation of these elements within the

claims indicates that the claim requires two separate matrices.

Shire even admits that the structure of the claim language requires two separate matrices. Oral Argument at 17:23–17:50, *Shire Dev., LLC v. Watson Pharms., Inc.*, No. 2013-1409 (Fed. Cir. Dec. 2, 2013), *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 13-1409.mp3 (Q: "It sounds like then, even though you opposed having the separate and distinct, that you agree that there has to be two different matrices?  A: Correct, separate, yes. . . . They're separate because by the claim, itself, it says an inner and an outer, so we're talking about two different matrices.  For sure, one is lipophilic, one is hydrophilic.  They're separate.  No question."); Appellees' Br. 34 ("[T]o the extent there is a 'separation' of matrices, the claim language addresses that by defining two matrices as opposed to one.").

Moreover, the logical reading of the claim requires separation between the matrices because the matrices are defined by mutually exclusive spatial characteristics—one inner, one outer—and mutually exclusive compositional characteristics—one hydrophilic, one lipophilic.  According to the ordinary and customary meanings of these characteristics, one matrix cannot be both inner and outer in relation to a second matrix.  Nor can one matrix be both hydrophilic and lipophilic.  Thus, considering matrix is properly construed as "a macroscopically homogenous structure in all its volume," the construction of "inner lipophilic matrix" requires the inner volume to be separate from the outer volume.  *See Phillips,* 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.     13

    The compositions of the inner volume and outer volume, i.e., inner matrix and outer matrix, respectively, are further limited by the Markush groups. During prosecution, the applicants added Markush groups to claim 1 to overcome the examiner's rejection of the claims as obvious over Franco. J.A. 15491–92. For example, the inner lipophilic matrix is limited by a Markush group "consisting of unsaturated and/or hydrogenated fatty acid, salts, esters or amides thereof, fatty acid mono-, di- or triglycerid[e]s, waxes, ceramides, and cholesterol derivatives with melting points below 90° C." '720 patent col. 6 ll. 11–14. The outer hydrophilic matrix is similarly limited by a Markush group consisting of hydrophilic components. *See* '720 patent col. 6 ll. 20–25. The lack of overlap of the components of the two Markush groups supports the requirement that the volumes be separate. Accordingly, the correct construction requires that the inner volume contain substances from the group described for the inner lipophilic matrix (which are all lipophilic substances), and that the outer volume separately contain substances from the group described for the outer hydrophilic matrix (which are all hydrophilic).

    The '720 patent specification also teaches "separate" matrices. The specification describes five examples of forming discrete lipophilic matrix granules and compressing those granules together with the hydrophilic matrix. *See, e.g.*, '720 patent col. 3 ll. 31–45. The specification explains that a lipophilic matrix "opposes some resistance to the penetration of the solvent due to the poor affinity towards aqueous fluids." '720 patent col. 1 ll. 17–20. And under the stipulated meaning of "lipophilic," the lipophilic matrix must have a "poor affinity towards aqueous fluids." J.A. 216. Thus, the matrix that is deemed the "lipophilic" matrix cannot have hydrophilic properties. But, a matrix comprised of only one lipophilic substance and several hydrophilic substances—and thus capable of exhibiting hydrophilic properties—would meet the district

court's construction of "lipophilic matrix." Such a result contradicts the customary and ordinary meaning of "lipophilic" and "hydrophilic."

Furthermore, under the district court's construction, a single mixed matrix with both hydrophilic and lipophilic components—such as the one disclosed in the Sanghvi reference, which the applicants described as "mixing together hydrophilic and lipophilic substances into a single matrix"—could contain both an "inner lipophilic matrix" and an "outer hydrophilic matrix." J.A. 15481. Indeed, any arbitrarily selected volume in a single mixed matrix would satisfy the district court's construction of "inner lipophilic matrix" because that volume would necessarily contain "at least one lipophilic excipient" and it would be "inside" the surrounding volume. Similarly, under the district court's construction, that same arbitrarily selected volume would constitute an "outer hydrophilic matrix" because it would contain "at least one hydrophilic excipient" and would be "outside" the inner lipophilic matrix. The claims, however, require two matrices with a defined spatial relationship.

Shire argues that the intrinsic evidence does not describe any particular degree of separation and thus, such a construction would create ambiguity. Shire's argument misses the point. A court must identify "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316. Whether or not a composition infringes when there is a trace of hydrophilic molecules in the inner volume because of the mixing step inherent in the manufacturing process, for example, is a question for the fact finder. That this question may need to be resolved does not compel a claim construction that departs from the customary and ordinary meaning of the claims, i.e., that the matrices must be "separate" such that they retain their claimed properties and are consistent with their respective Markush group limitations.

SHIRE DEVELOPMENT, LLC v. WATSON PHARMACEUTICALS, INC.     15

## IV.

Accordingly, we reverse the district court's constructions of "inner lipophilic matrix" and "outer hydrophilic matrix," and subsequent infringement determination, and remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED**

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INFORMATION SHEET

FILING A PETITION FOR A WRIT OF CERTIORARI

There is no automatic right of appeal to the Supreme Court of the United States from judgments of the Federal Circuit. You must file a petition for a writ of certiorari which the Supreme Court will grant only when there are compelling reasons. (See Rule 10 of the Rules of the Supreme Court of the United States, hereinafter called Rules.)

**Time.** The petition must be filed in the Supreme Court of the United States within 90 days of the entry of judgment in this Court or within 90 days of the denial of a timely petition for rehearing. The judgment is entered on the day the Federal Circuit issues a final decision in your case. [The time does not run from the issuance of the mandate, which has no effect on the right to petition.] (See Rule 13 of the Rules.)

**Fees.** Either the $300 docketing fee or a motion for leave to proceed in forma pauperis with an affidavit in support thereof must accompany the petition. (See Rules 38 and 39.)

**Authorized Filer.** The petition must be filed by a member of the bar of the Supreme Court of the United States or by the petitioner representing himself or herself.

**Format of a Petition.** The Rules are very specific about the order of the required information and should be consulted before you start drafting your petition. (See Rule 14.) Rules 33 and 34 should be consulted regarding type size and font, paper size, paper weight, margins, page limits, cover, etc.

**Number of Copies.** Forty copies of a petition must be filed unless the petitioner is proceeding in forma pauperis, in which case an original and ten copies of the petition for writ of certiorari and of the motion for leave to proceed in forma pauperis. (See Rule 12.)

**Where to File**. You must file your documents at the Supreme Court.

**Clerk**
**Supreme Court of the United States**
**1 First Street, NE**
**Washington, DC 20543**
**(202) 479-3000**

No documents are filed at the Federal Circuit and the Federal Circuit provides no information to the Supreme Court unless the Supreme Court asks for the information.

**Access to the Rules.** The current rules can be found in Title 28 of the United States Code Annotated and other legal publications available in many public libraries.

Revised December 16, 1999

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

*Questions and Answers*

**Petitions for Rehearing (Fed. Cir. R. 40)
and
Petitions for Hearing or Rehearing En Banc (Fed. Cir. R. 35)**

---

*Q. When is a petition for rehearing appropriate?*

A. Petitions for rehearing are rarely considered meritorious. Consequently, it is easiest to first answer when a petition for rehearing is not appropriate. A petition for rehearing should not be used to reargue issues already briefed and orally argued. If a party failed to persuade the court on an issue in the first instance, they do not get a second chance. This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36, as a disposition of this nature is used only when the appellant has utterly failed to raise any issues in the appeal that require an opinion to be written in support of the court's judgment of affirmance.

Thus, as a usual prerequisite, the court must have filed an opinion in support of its judgment for a petition for rehearing to be appropriate. Counsel seeking rehearing must be able to identify in the court's opinion a material error of fact or law, the correction of which would require a different judgment on appeal.

*Q. When is a petition for hearing or rehearing en banc appropriate?*

A. En banc decisions are extraordinary occurrences. To properly answer the question, one must first understand the responsibility of a three-judge merits panel of the court. The panel is charged with deciding individual appeals according to the law of the circuit as established in the court's precedential opinions. While each merits panel is empowered to enter precedential opinions, the ultimate duty of the court en banc is to set forth the law of the Federal Circuit, which merit panels are obliged to follow.

Thus, as a usual prerequisite, a merits panel of the court must have entered a precedential opinion in support of its judgment for a suggestion for rehearing en banc to be appropriate. In addition, the party seeking rehearing en banc must show that either the merits panel has failed to follow identifiable decisions of the U.S. Supreme Court or Federal Circuit precedential opinions or that the merits panel has followed circuit precedent, which the party seeks to have overruled by the court en banc.

*Q. How frequently are petitions for rehearing granted by merits panels or petitions for rehearing en banc accepted by the court?*

A. The data regarding petitions for rehearing since 1982 shows that merits panels granted some relief in only three percent of the more than 1900 petitions filed. The relief granted usually involved only minor corrections of factual misstatements, rarely resulting in a change of outcome in the decision.

En banc petitions were accepted less frequently, in only 16 of more than 1100 requests. Historically, the court itself initiated en banc review in more than half (21 of 37) of the very few appeals decided en banc since 1982. This sua sponte, en banc review is a by-product of the court's practice of circulating every precedential panel decision to all the judges of the Federal Circuit before it is published. No count is kept of sua sponte, en banc polls that fail to carry enough judges, but one of the reasons that virtually all of the more than 1100 petitions made by the parties since 1982 have been declined is that the court itself has already implicitly approved the precedential opinions before they are filed by the merits panel.

*Q. Is it necessary to have filed either of these petitions before filing a petition for certiorari in the U.S. Supreme Court?*

A. No. All that is needed is a final judgment of the Court of Appeals. As a matter of interest, very few petitions for certiorari from Federal Circuit decisions are granted. Since 1982, the U.S. Supreme Court has granted certiorari in only 31 appeals heard in the Federal Circuit. Almost 1000 petitions for certiorari have been filed in that period.

July 21, 2008